**UNITED STATES of America, Appellee,**

v.

**Raymond J. PEERY, Appellant.**

No. 92–1245.

United States Court of Appeals, Eighth Circuit.

Submitted Aug. 12, 1992.

Decided Oct. 14, 1992.

Vincent M. Powers, Lincoln, Neb., argued, for appellant.

Alan Lee Everett, Lincoln, Neb., argued (Ronald D. Lahners and Steven A. Russell, on brief), for appellee.

Before MAGILL, Circuit Judge, HEANEY, Senior Circuit Judge, and LOKEN, Circuit Judge.

HEANEY, Senior Circuit Judge.

Raymond Peery appeals his conviction for theft and money laundering and his resultant sentence. We affirm.

## BACKGROUND

Raymond Peery was formerly the Executive Director and General Counsel for the Central Interstate Low–Level Radioactive Waste Compact Commission (Compact Commission), a five-state entity in charge of siting, initiating the construction of, and operating a disposal facility for low-level radioactive waste generated within the member states. The Low–Level Radioactive Waste Policy Act Amendments of 1985, 42 U.S.C. § 2021b–2021i, authorized states to form such compact commissions to develop regional disposal facilities and to charge for disposal. Congress mandated that twenty-five percent of the facilities' surcharges be paid to the Department of Energy, which in turn distributed the money to the various compact commissions when it determined that they had achieved certain congressionally established goals. *See* 42 U.S.C. § 2021e(d)(1)–2021e(d)(2)(G). Pursuant to this arrangement, on March 15, 1990, the Compact Commission received $848,365.95 from the Department of Energy.

The government's investigation, indictment, and trial of Peery focused on the one-year period following the Compact Commission's receipt of this money. The government charged Peery with one count of theft in violation of 18 U.S.C. § 666, which applies (in pertinent part) to thefts of over $5,000 from an organization by an agent of the organization if the organization receives federal benefits in excess of $10,000 during a one-year period. The government also charged Peery with three counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). At trial, the government presented evidence that Peery stole at least $798,780 from the Compact Commission and purchased twelve cars, ten Rolex watches, ski trips, vacations to Lake Tahoe and Disney World, a $300,000 house for which he made an $86,000 down payment, an $8,800 jukebox, and a fur coat during the period in question. A jury convicted Peery of each count, and pursuant to the sentencing guidelines, the district court sentenced him to 50 months imprisonment and ordered him to pay $555,120.34 in restitution.

## DISCUSSION

### I. 18 U.S.C. § 666

Peery first contends that 18 U.S.C. § 666 does not apply to his case. To violate this statute, the organization from which the funds were stolen must receive "benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." 18 U.S.C. § 666(b). Peery argues that the "benefits" or "Federal assistance" contemplated by 18 U.S.C. § 666(b) are not present here because the government never owned the money it distributed to the Compact Commission.[1]

■ In making this argument, Peery assumes that "benefits" or "Federal assistance" means federal tax dollars. The broad language of the statute, incorporating all forms of federal assistance with its principal limitation merely being that an organization receive more than $10,000 in a one-year period for the statute to be applicable, reveals error in Peery's narrowing assumption. The statute's legislative history confirms this revelation.

Congress expressly intended that 18 U.S.C. § 666(b) be broadly construed.

> The Committee intends that the term "Federal program involving a grant, a contract, a subsidy, a loan, a guarantee, or another form of Federal Assistance" be broadly construed, consistent with the purpose of this section to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery. However, the concept is not unlimited. The term "Federal program" means that there must exist a specific statutory scheme authorizing the Federal assistance in order to promote or achieve certain policy objectives.

S.Rep. No. 225, 98th Cong., 1st Sess. 370 (1983). As we discuss in the following paragraph, under a broad construction, the Compact Commission received "Federal Assistance." Indeed, the "specific statutory scheme" that Congress required for section 666 to apply is present in this case.

For Section 666 to apply, "there must exist a specific statutory scheme authorizing the Federal assistance [to the organization from which money was stolen] in order to promote or achieve certain policy objectives." S.Rep. No. 225, 98th Cong., 1st Sess. 370 (1983). Congress enacted the Low–Level Radioactive Waste Policy Act Amendments of 1985 to address the growing national problem of radioactive waste disposal, which the Low–Level Radioactive Waste Policy Act of 1980 was not solving. *Low–Level Radioactive Waste: Hearings before the Subcomm. on Energy and Con-*

---

1.  42 U.S.C. § 2021e(d)(2)(A) provides:
    Escrow Account:
       Twenty-five per centum of all surcharges received by a State pursuant to paragraph (1) during the seven-year period referred to in subsection (a) of this section shall be transferred on a monthly basis to an escrow account held by the Secretary. The Secretary shall deposit all funds received in a special escrow account. *The funds so deposited shall not be the property of the United States....* (emphasis added).

*servation and Power of the House Comm. on Energy and Commerce,* 99th Cong., 1st Sess. 1–2 (1985) (Statement of Rep. Markley, Chairman). In 1980, only three states had low-level radioactive waste disposal facilities. The 1980 act burdened states with disposing the waste produced within their borders by establishing regional disposal facilities and "embodied assurances to the three sited States that they could exclude waste from outside their regions by January 1, 1986." *Id.* at 2. By 1985, however, the states had not developed any new facilities, and the three states with existing facilities threatened to refuse to accept waste from outside of their regions. *See* 131 Cong.Rec. H11,409 (daily ed. Dec. 9, 1985). Faced with this problem, Congress passed the 1985 amendments to force the development of new facilities and to ensure that the states with existing facilities kept their facilities open to the nation for an additional seven years. *See* 131 Cong.Rec. S18,103–S18,105 (daily ed. Dec. 19, 1985).

■■■■ To ensure compliance and to prevent a repeat of the 1980 failure, the 1985 amendments incorporated specific goals for the states to meet. *Id.* Congress chose to spur the attainment of these goals with a stick (the twenty-five percent surcharge) and a carrot (the possibility of a rebate if the states meet the Congressional goals), as outlined in 42 U.S.C. § 2021e. *Id.* Thus, under the 1985 amendments, the Secretary of Energy first collects the surcharge and if the compact commissions satisfy waste disposal goals, then they receive rebates. Even after it distributes the rebate, the federal government continues to oversee the compact commissions by regulating their use of the funds with strict reporting and compliance requirements to ensure the advancement of specified federal policies. 42 U.S.C. § 2021e(d)(2)(E). The 1985 amendments further involve the federal government in the business of the compact commissions by ordering the Secretary of Energy to provide the compact commissions with financial and technical assistance. 42 U.S.C. § 2021g(a)(1) directs:

[The Secretary of Energy shall provide to the compact commissions] continuing technical assistance to assist them in fulfilling their responsibilities under sections 2021b to 2021j of this title. Such technical assistance shall include, but not be limited to, technical guidelines for site selection, alternative technologies for low-level radioactive waste disposal, volume reduction options, management techniques to reduce low-level waste generation, transportation practices for shipment of low-level wastes, health and safety considerations in the storage, shipment and disposal of low-level radioactive wastes, and establishment of a computerized database to monitor the management of low-level radioactive wastes.

In sum, the 1985 amendments reflect Congress' attempt to maintain federal oversight of low-level radioactive waste disposal while simultaneously permitting the bodies closest to the problem to implement Congressional policies. This effort persuades us that the Compact Commission's receipt of the rebate constituted "Federal assistance" as part of a "Federal program," and thus, we affirm Peery's conviction for violating 18 U.S.C. § 666.[2]

---

**2.** As an alternative argument, Peery characterizes Section 666 as unconstitutionally vague and overbroad. Even without the guidance of legislative history, the language of the statute explains that it applies to "benefits ... under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance or other form of Federal assistance," and that the money be stolen from an organization which received at least $10,000 in a one-year period under a federal program. Given the broad sweep of this language and its minimal limitations, we do not find the statute to be unconstitutional as applied to Peery, because he could reasonably believe that Section 666 would apply to him.

Peery also argues that his Section 666 conviction should be reversed because before the Grand Jury and during oral argument the government claimed that the Compact Commission received "Federal funds," (as opposed to "Federal assistance," or some other statutory buzz phrase) and because as the trial evolved, the government recharacterized its claim to conform to the statutory language and the facts of this case. The district court rejected Peery's argument, ruling that the classification of the Compact Commission's rebate is a matter of law for judicial determination. As our handling of section 666 implies, we agree that determining whether section 666 applies to Peery's conduct

## II. *Money Laundering*

■ Peery next argues that the government did not offer sufficient evidence to support his conviction for three counts of money laundering pursuant to 18 U.S.C. § 1956(a)(1)(B)(i). When reviewing a sufficiency of the evidence claim, we must consider the evidence in the light most favorable to the government and also accept all reasonable inferences that support the jury's verdict. *See, e.g., United States v. Jones,* 880 F.2d 55, 64 (8th Cir.1989). Moreover, "[w]e will reverse only if the jury must have entertained reasonable doubt as to the defendant's guilt." *Id.* (citation omitted). To be convicted under section 1956(a)(1)(B)(i), Peery must have conducted a financial transaction "knowing that the transaction is designed in whole or part ... to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). Each of Peery's money laundering counts corresponds to a wire transfer from Peery's personal bank account in Atlanta, Georgia to his personal bank account in Lincoln, Nebraska. In a cursory argument, Peery contends that the government did not prove beyond a reasonable doubt that Peery acted to conceal the nature, location, source, ownership, and control of the proceeds. We disagree.

Peery did more than merely transfer funds from one personal account to another personal account. The funds deposited into his Lincoln account were first taken from the Compact Commission's accounts in Lincoln, then deposited in Peery's Atlanta account, and then finally wired to his Lincoln account. Indeed, with respect to the wire transfers underlying each of Peery's money laundering counts, via three separate wires, Peery transferred money from his Atlanta account to his Lincoln account and then purchased cashier's checks to satisfy two car loans and to make an $86,644.62 down payment for a house. Viewing this evidence in the light most favorable to the government convinces us that it proved beyond a reasonable doubt that Peery conducted financial transactions with the intent to conceal the nature, location, source, ownership, and control of the proceeds.[3]

## III. *Sentence*

■ Peery finally claims that because prior to his trial he cooperated with the Compact Commission to gather his assets for liquidation and because the purpose of his trial was to test applicability of 18 U.S.C. § 666 to his conduct, he should have been granted a two-level reduction for acceptance of responsibility. *See* U.S.S.G. § 3E1.1 application note 2 (convicted defendant should not be denied acceptance of responsibility where he exercises his constitutional right to a trial to contest the applicability of a statute to his guilt while simultaneously accepting responsibility for his criminal conduct). While one of Peery's defense theories rested on the applicability of section 666 to his conduct, our review of the trial record reveals Peery also argued that he possessed a good faith belief that he was authorized to spend the Compact Commission's money in the manner that he did. Peery developed this latter theory of defense during his opening argument, during the trial itself, and during his closing argument. Thus, the trial focused not only on the relevancy of section 666 but also on Peery's factual guilt.

This court has established that it will reverse an acceptance of responsibility de-

---

is a question of law. In any event, on appeal, Peery offers scant, if any, persuasive support for his claim, and we find no merit in it.

**3.** The government adduced other evidence of Peery's illicit activities. For instance, on numerous occasions, Peery arranged for funds to be transferred directly from the Compact Commission's account into his personal account in Atlanta. After Peery deposited Compact Com- mission funds in his accounts, he purchased numerous luxury items, including a 1990 Jaguar for $35,059; $4,540.05 worth of furniture; and a ladies' diamond wedding ring set for $5,856.44. Moreover, on several occasions funds were wired directly from the Compact Commission's account to two car dealers to purchase cars in Peery's name.

termination only where the district court committed clear error while emphasizing that we give great deference to the district court's acceptance of responsibility ruling. *See United States v. Miller*, 951 F.2d 164, 165 (8th Cir.1991). Under this standard, we will not reverse the district court's refusal to grant Peery a two-level reduction for acceptance of responsibility.

Accordingly, we affirm both Peery's conviction and sentence.