**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 92-7371

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

CHRISTOPHER P. ALFORD,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Southern District of Mississippi

---

(August 23, 1993)

Before POLITZ, Chief Judge, REYNALDO G. GARZA and JOLLY, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

Christopher P. Alford appeals his conviction of conspiracy to commit fraud, mail fraud, money laundering and securities violations. Finding no error, we AFFIRM.

## I. FACTS

Christopher P. Alford formed Alford Oil Company in 1982; he met Jerry Lampley in 1984 or 1985 and they formed a close business and personal relationship. Lampley marketed oil and gas interests through various companies including Petro-Serve, Ltd. Alford and Lampley would meet with Lampley's associates to discuss marketable drilling sites.

Petro-Serve entered into contracts with Alford Oil calling for Alford Oil to operate wells;

Alford was paid a flat rate plus twenty to thirty percent to cover his risk of loss. Lampley and Alford also split an additional "secret" percentage profit margin about which investors were never informed. To provide this profit margin, Alford Oil's invoices to Lampley's companies were inflated. Furthermore, the invoices were doubled to provide a marketing and promotion fee to Lampley's marketing companies.

Lampley's sales people made misrepresentations to investors, both orally and in written prospectus. Investors were told that most of their investment funds would be used to pay actual drilling costs and that they would receive a full return on their investment in one to three years. Alford's resume was also falsified regarding his academic credentials and experience in the industry. With Alford's approval, unfavorable geological information was omitted from reports to investors.

The checks from the investors were normally sent through the mail, deposited into Lampley's company's operating account, switched to Petro-Serve's account, and then a portion forwarded to Alford Oil in payments of its invoices. Alford and Lampley's scheme brought in approximately $44 million from investors from 1985 through 1987; Alford Oil Company received roughly one-half of this amount. Approximately $2,887,002 went into Alford's personal account. Alford Oil also disbursed a $100,000 check to Lampley and a $40,000 check to Alford, both checks were cashed in Las Vegas.

## II. PROCEDURAL HISTORY

Alford was charged with one count of conspiracy to commit mail fraud, wire fraud, money laundering and securities violations (18 U.S.C. § 371); thirteen counts of mail fraud (18 U.S.C. § 1341); one count of wire fraud (18 U.S.C. § 1343); eleven counts of using interstate commerce fraudulently to sell securities (15 U.S.C. § 77q(a) and § 77x); and eleven counts of money laundering (18 U.S.C. § 1956(a)(1)).

Alford was arraigned on August 7, 1991 and was represented by retained counsel. The trial was originally scheduled for October 21, 1991, but was re-scheduled for February 10, 1992,

2

due to the volume of discovery in the case. The government tendered discovery documents to Alford on September 3, 1991, and Alford (along with his attorney and investigator) began reviewing them shortly thereafter. Substitute counsel was appointed for Alford on December 10, 1991, after Alford's original attorney motioned for withdrawal for nonpayment of fees. In February of 1992, the discovery materials were again made available to Alford and his attorney. The trial was once again continued until March 2, 1992, based in part upon family difficulties experienced by Alford's counsel.

The jury convicted Alford on counts 1 through 7, 9, 11, 12, 15 through 19, and 24 through 32; he was acquitted on counts 8, 10, and 20 through 23.[1] The district court sentenced Alford to twenty years on count 24; imposition of sentence was suspended on the remaining counts and Alford was placed on probation for a term of five years commencing upon his release from incarceration. Alford was also ordered to pay a fine of $5,000,000 and a special assessment of $1,200.

## III. DISCUSSION

Alford was convicted of conspiracy to commit fraud, mail fraud, money laundering and securities violations. Alford claims the district court erred in: (1) denying him surrebuttal to meet new issues presented by the government's rebuttal; (2) failing to grant him a continuance to prepare adequately for trial; (3) asserting jurisdiction over counts 24 through 32 because the indictment lacked a constituent element of money laundering; (4) finding sufficient evidence in counts 24 through 32 to establish the laundering of money instruments; and (5) failing to require unanimity of the verdict by all jurors as to the same manner or means alleged in counts 24 through 32.

The district court did not err in: (1) denying Alford surrebuttal; (2) denying Alford a continuance; (3) asserting jurisdiction over the money laundering counts; (4) finding sufficient evidence to establish money laundering; and (5) failing to require unanimity of the verdict.

---

[1] Two mail fraud counts (counts 13 & 14) were dismissed prior to trial.

Finding no error, we AFFIRM.

A.      Denial of Surrebuttal

Alford challenges the district court's denial of surrebuttal.  The decision to permit surrebuttal falls within the discretion of the district court and is subject to an abuse of discretion standard.  United States v. Moody, 903 F. 2d 321, 330 (5th Cir. 1990).  Surrebuttal is merited where: (1) the government's rebuttal testimony raises a new issue, which broadens the scope of the government's case; and (2) the defense's proffered surrebuttal testimony is not tangential, but capable of discrediting the essence of the government's rebuttal testimony.  Id. at 331.

Alford testified on direct examination that he had never conspired to scheme or defraud anybody out of anything and that his invoices were not inflated; furthermore, Alford specifically denied having been asked to return money to investors because of inflated invoices.  To rebut Alford's testimony, the government called an auditor who testified that during an audit of Alford's previous company he discovered inflated invoicing.  The government then called another witness who testified that his father's estate had been overbilled by Alford's previous company and that the audit resulted in the estate receiving credits for the payments on the overbillings.

Alford argues that the information introduced by the government's rebuttal witnesses was extremely prejudicial.  Alford, however, during cross-examination had the opportunity to attack the credibility of the auditor and the witness whose father's estate had been overbilled.  For example, Alford, himself, states that on cross-examination the auditor admitted that if Alford were afforded the opportunity, he could possibly clarify questions the auditor had about the audit.  Hence, the credibility of the government's rebuttal witnesses was clearly before the jury.

Alford further argues that the district court's practice of never allowing surrebuttal allowed the government to go into extrinsic matters on rebuttal knowing that Alford would be denied any opportunity to refute the evidence.

Alford, however, failed to proffer to the district court the substance of his surrebuttal testimony.  This denied the district court the opportunity to determine whether the surrebuttal

4

could discredit the government's rebuttal testimony. See Moody 903 F.2d at 331. Although Judge Gex, the district court judge, clearly erred in stating that "[surrebuttal] does not exist ... in this court, never has;" the district court did not abuse its discretion in denying Alford surrebuttal in this case.

B.      Denial of Continuance

Alford also challenges the district court's denial of his motion for continuance. "The grant or denial of a continuance is within the sound discretion of the trial court, and will be disturbed on appeal only for abuse of discretion." United States v. Kelly, 973 F.2d 1145, 1147-48 (5th Cir. 1992). Alford must demonstrate an abuse of discretion resulting in serious prejudice. See United States v. Webster, 734 F.2d 1048, 1056 (5th Cir.), cert. denied, 469 U.S. 1073 (1984).

On August 7, 1991, Alford appeared for arraignment represented by his retained counsel George Bloss. The parties were informed at that time that trial would commence on February 10, 1992. On October 31, 1991, Bloss moved to withdraw because Alford had failed pay him for his services. At the hearing on the motion to withdraw, the government stated that this was a rather complex case and expressed concern that a new lawyer might require a continuance to prepare for trial. The government also stated that Bloss had hired a private investigator and had completed discovery. The district court, because it was not inclined to bring in a new attorney, appointed Bloss as counsel for Alford.

On December 10, 1991, the district court granted Bloss' motion to withdraw as appointed counsel and appointed as substitute counsel Michael Crosby. The district court appointed Crosby substitute counsel only after Crosby affirmatively represented that he was familiar with the general circumstances and nature of Alford's case.

On February 4, 1992 the trial was continued until March 2, 1992, in response to a joint motion by the government and Alford based on Crosby's inability to prepare adequately for trial as a result of the premature birth of his child. Alford was also given an additional week to file motions but he did not file any.

5

On February 24, 1992, Crosby filed a second motion for continuance claiming that Alford was prepared to retain counsel and that he and Alford had never fully agreed on the manner in which the defense should be prepared. Alford, himself, moved for a continuance, claiming that Crosby had neither the time nor the resources to prepare adequately for trial. On March 2, 1992, the scheduled trial date, the district court held a hearing at which both Alford and Crosby detailed their ineffective attempts to prepare. Crosby stated that he had a good understanding of the prosecution's case; however, he also voiced concerns about his ability to understand and put together Alford's defense. The district court denied the motion but granted Alford an additional day after jury selection to review the government's materials.

Alford argues that the factual presentation in his case was exceedingly complex, as were the various legal theories drawn into question by the government. Alford states that it "is irrefutable that over 65 boxes of documents were literally dumped on Crosby, as were over 150 audio and video tapes, many of which were not identified as to person, place or time." Alford argues that the government's "quest" was to inundate him with materials.

As the government notes, Crosby, Alford's appointed trial counsel, began representing Alford more than eighty days before trial began and Alford himself began his preparation some 182 days before trial by reviewing the government's discovery. Furthermore, Alford had the services of a private investigator hired by his original attorney in addition to the assistance of a government-paid investigator during pre-trial and the trial itself. Finally, Alford's trial counsel had a sound knowledge of the case, conducted effective cross-examination, and mounted a vigorous and effective defense, acquitting Alford on six counts. Accordingly, the district court did not abuse its discretion in denying Alford's motion for continuance.

C.    Sufficiency of The Indictment

Alford also challenges the sufficiency of the indictment. Alford's indictment, relative to counts 24 through 32, the money laundering counts, reads as follows:

On or about the dates listed below for Counts XXI through XXXII, in the Southern Division of the Southern District of Mississippi, and elsewhere, defendant[] ALFORD ... , together with others known and unknown to the Grand Jury, knowing that the amounts listed below for Counts XXI through XXXII were the proceeds of an unlawful activity as defined in 18 U.S.C. § 1956(c)(7)(A), that is 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud, did conduct, and attempt to conduct, certain financial transactions, as listed below for Counts XXI through XXXII, knowing the transactions were designed with intent to promote the carrying on of or to conceal or disguise the nature, location, source, ownership, or the control of the proceeds of, specified unlawful activity, to-wit: mail fraud and wire fraud ...

The indictment then, under the heading of "Financial Transactions" described the specific financial transaction associated with each count.

Alford asserts that an essential element of a § 1956(a)(1) prosecution is that the financial transaction in fact involve the proceeds of specified unlawful activity.[2] Alford contends that since no such averment appears in any of the money laundering counts in his indictment, the district court's jurisdiction was never properly invoked because an essential element of money laundering is missing as to each count.

"An indictment must allege every element of the crime charged." United States v. Merritt, 882 F.2d 916, 918 (5th Cir. 1989), cert. denied, 496 U.S. 907 (1990). "An indictment is sufficient if (1) it contains the elements of the offense charged, (2) it fairly informs the defendant of the charge he must meet, and (3) there is no risk of future prosecutions for the same offense." United States v. Arlen, 947 F.2d 139, 144 (5th Cir. 1991), cert. denied, ___U.S.___, 112 S.Ct.

---

[2] Title 18 U.S.C. § 1956 (a)(1) provides in pertinent part,

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

(B) knowing that the transaction is designed in whole or in part--
    (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity

7

1480, 117 L.Ed.2d 623 (1992). Whether an indictment sufficiently alleges the elements of an offense is a question of law to be reviewed de novo. United States v. Shelton, 937 F.2d 140, 142 (5th Cir.), cert. denied, ___U.S.___, 112 S.Ct. 607, 116 L.Ed.2d 630 (1991). Furthermore, if an allegation is jurisdictional, it is essential. United States v. Green, 964 F.2d 365, 374 (5th Cir. 1992), cert. denied, ___U.S.___, 113 S.Ct. 984, 122 L.Ed.2d 137 (1993).

Alford failed to object to the sufficiency of the indictment in the trial court and raises this point for the first time on appeal. Therefore, we read the indictment liberally to be sufficient, "unless it is so defective that by any reasonable construction, it fails to charge an offense for which the defendant is convicted." United States v. Salinas, 956 F.2d 80, 82 (5th Cir. 1992) (citations omitted).

Based on a liberal construction of the indictment, we find that the indictment alleges that the proceeds of the financial transactions were in fact proceeds of specified unlawful activity. Therefore, we do not reach the question of whether an allegation that the proceeds of the financial transaction were in fact the proceeds of specified unlawful activity is jurisdictional and, thus, an essential element of the offense.

D.    Sufficiency of The Evidence

Alford asserts that there was insufficient evidence to support his conviction for the laundering of money instruments. We review his claim under the established standard that the Court view the evidence, "whether direct or circumstantial, and all the inferences reasonably drawn from it, in the light most favorable to the verdict." U.S. v. Salazar, 958 F.2d 1285, 1991 (5th Cir.), cert. denied, ___U.S.___, 113 S.Ct. 185, 121 L.Ed.2d 129 (1992). "The ultimate test for sufficiency of the evidence challenges is whether a reasonable jury could find that the evidence establishes guilt beyond a reasonable doubt." Id. (citing United States v. Gonzales, 866 F.2d 781 (5th Cir.), cert. denied, 490 U.S. 1093, 109 S.Ct. 2438, 104 L.Ed.2d 994 (1989)).

In a section 1956 (a)(1) prosecution for the laundering of monetary instruments, the government must prove the defendant:

knowing that the property involved in a financial transaction represent[ed] the proceeds of some form of unlawful activity, conduct[ed] or attempt[ed]to conduct such a financial transaction which in fact involve[d] the proceeds of specified unlawful activity-

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

(B) knowing that the transaction [was] designed in whole or      in part--
   (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

18 U.S.C. § 1956 (a)(1).

Alford asserts that the three others named in the indictment did not testify, and that at trial he flatly denied any culpability as to money laundering. Alford suggests that the government's theory was that funds were moved by wire and mail from Magnolia Development Corporation[3] in Mississippi to Alford Oil's account in Houston, and that this activity took place either with an intent to promote and carry on mail and wire fraud or with an intent to conceal or disguise the nature, location, source, ownership, or the control of the proceeds of mail or wire fraud.

Alford argues that there is simply a lack of relevant testimony or documentary evidence addressing the money laundering counts. Alford also argues that no testimony was adduced that he willfully participated with anyone and shared a criminal intent and engaged in some affirmative conduct to aid the laundering of monetary instruments.

We find that the evidence establishes that Lampley and Alford agreed to split proceeds from their fraudulent scheme. The fraudulent funds were mailed by Lampley to an Alford Oil Company bank account pursuant to a prearranged agreement whereby Alford would submit inflated invoices to Lampley and Lampley would pay Alford Oil Company the inflated amount. Alford then used these funds to continue to promote the mail and wire fraud scheme by presenting himself and his company as a successful operator/owner of a drilling company.

Based upon these facts, a jury could reasonably determine that the checks described in the money laundering counts constituted financial transactions designed with the intent to promote

---

[3] Magnolia Development Corporation was the successor to Petro-Serve.

9

the carrying on of the fraudulent scheme. A jury could also reasonably determine that the checks served the purpose of disguising the nature, location and control of the proceeds of the mail and wire fraud scheme.

Our review of the record, therefore, indicates that sufficient evidence exists to affirm Alford's conviction for money laundering.

E.        Unanimity of The Verdict

Finally, Alford argues that it cannot be discerned whether the jury based its verdict upon a § 1956(a)(1)(A)(i) or (B)(i) finding. Alford argues that where a jury could find him guilty on a single count under multiple theories of liability, a specific unanimity instruction is constitutionally required. Alford concedes, however, that his trial counsel did not object to the jury instructions. Therefore, this alleged error is subject only to the plain error standard of review. Fed. R. Crim. Pro. 52(b).

"A plain error is one which is `so fundamental as to have resulted in a miscarriage of justice.'" U.S. v. Razo-Leora, 961 F.2d 1140, 1147 (5th Cir. 1992). The district court's failure to include a unanimity instruction in this case does not rise to the level of plain error. Id.

IV.

For the reasons stated above Alford's conviction is AFFIRMED.

10