**UNITED STATES of America, Plaintiff–Appellee,**

v.

**James Larry DOBBS, Defendant–Appellant.**

No. 94–40606.

United States Court of Appeals, Fifth Circuit.

Aug. 24, 1995.

Rehearing Denied Oct. 11, 1995.

James Rodgers, Moore Payne Clem Rodgers & Hodgkiss (Court-appointed), Paris, TX, for appellant.

Traci L. Kenner, Asst. U.S. Atty., Tyler, TX, Michael Ernest Savage, Asst. U.S. Atty., Mike Bradford, U.S. Atty., Sherman, TX, for appellee.

Before POLITZ, Chief Judge, EMILIO M. GARZA and STEWART, Circuit Judges.

STEWART, Circuit Judge:

James L. Dobbs appeals his convictions for fraudulently disposing of the collateral of the Farmers Home Administration (FmHA), bank fraud, and money laundering. For the following reasons, his convictions for money laundering are reversed and his remaining convictions are affirmed.

## BACKGROUND

James Larry Dobbs was a long-time cattle farmer and rancher in Honey Grove, Texas. He was a regular customer of the Farmers & Merchants Bank (F & M) of Ladonia, Texas, where he borrowed money to carry on his farming and ranching operations. Beginning in 1985, Dobbs also began borrowing money from FmHA. He developed a good and substantial loan history with both FmHA and F & M.

On January 5, 1989, Dobbs borrowed $175,000 from FmHA to start a cow-calf operation[1], with the first of seven annual installments due January 1, 1990. Under his agreement with FmHA, Dobbs would purchase approximately 330 cows and some bulls, in order to produce calves for resale. FmHA paid off Dobbs' outstanding bank loans to F & M except for one equipment loan, and immediately advanced him $16,000 for operating expenses. After FmHA refinanced the F & M loan, Dobbs agreed not to obtain any other bank loans to purchase additional cows. Due to the possibility of confusing collateral, FmHA does not like for farmers to have cattle mortgaged to local lenders.

In 1989, Dobbs' entire cattle herd was quarantined by the state after certain cattle tested positive for brucellosis[2]. On November 16, 1988, Dobbs advised his County Supervisor for the FmHA that he had sold all of his cattle for slaughter without authority and did not have enough money from the proceeds to pay both FmHA and F & M. FmHA agreed to give Dobbs a new loan and schedule payments over seven years if he applied the proceeds from his unauthorized sale to his outstanding FmHA loan. Dobbs agreed.

In 1991, despite promises to the contrary, Dobbs borrowed approximately $101,000 from F & M in five separate notes to buy approximately 190 head of cattle. Dobbs signed a security agreement in which he agreed not to sell any collateral without prior written consent. In addition to its dealings with Larry Dobbs, F & M made loans to Dobbs' children to buy another 120 head of cattle. Although the loans were made in the children's name, the bank knew that Dobbs would manage the cattle bought in his children's names.

In April 1992, the FmHA sent Dobbs a letter informing him of a collateral inspection. Dobbs responded by informing the FmHA that he had sold all of the cattle forming the basis of the FmHA's collateral. Although he brought in receipts for the cattle he did not repay the outstanding balance of approximately $182,000. In July 1992, F & M bank also tried to inspect its collateral. Dobbs responded by informing the bank that he had sold all of its collateral and had used all of the proceeds for operating expenses. Dobbs owed approximately $85,000 to F & M.

After a criminal referral by the FmHA, Dobbs was indicted on one count of disposing of FmHA collateral in violation of 18 U.S.C. § 658, two counts of bank fraud in violation of 18 U.S.C. § 1344 and eight counts of money laundering in violation of 18 U.S.C. § 1956(a)(1). After a jury trial, he was convicted on one count of disposing of FmHA property, two counts of bank fraud, and two counts of money laundering. He was sentenced to forty-eight months of imprisonment and ordered to pay a special assessment of

---

1. The advantage of a cow-calf operation is that a farmer produces new calves, as opposed to merely fattening up the cows he has and reselling them after a year under the stocker operation.

2. Brucellosis is commonly referred to in the cattle industry as "Bangs." Presence of this disease can have a devastating impact on a cattle operation.

$250. He was also ordered to pay restitution of $181,8444.03 to the U.S. Department of Agriculture and $89,325.62 to F & M. Dobbs appeals his convictions.

## DISCUSSION

### I. FRAUDULENT DISPOSING OF FmHA COLLATERAL CONVICTION

Dobbs contends that there is insufficient evidence in the record to convict him of fraudulent disposing of property mortgaged to the FmHA. It is the jury's "unique role" to judge the credibility and evaluate the demeanor of witnesses and to decide how much weight should be given to their testimony. *United States v. Higdon,* 832 F.2d 312, 315 (5th Cir.1987), *cert. denied,* 484 U.S. 1075, 108 S.Ct. 1051, 98 L.Ed.2d 1013 (1988). Our resulting narrow standard of review for sufficiency of the evidence challenges "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

A sufficiency of the evidence challenge fails if a rational trier of fact could have found that the Government proved the essential elements of the crime charged beyond a reasonable doubt. *United States v. Webster,* 960 F.2d 1301, 1307–08 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 355, 121 L.Ed.2d 269 (1992). Toward that end, "[w]e must view the evidence in the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the jury." *United States v. Carrasco,* 830 F.2d 41, 43 (5th Cir.1987) (footnote omitted). Moreover, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.... A jury is free to choose among reasonable constructions of the evidence." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). Finally, "our review remains the same whether the evidence is direct or circumstantial." *United States v. Cardenas,* 9 F.3d 1139, 1156 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2150, 128 L.Ed.2d 876 (1994).

■ In order to obtain a conviction under 18 U.S.C. § 658, the government must prove three things: first, that Dobbs knowingly and wilfully disposed of, or converted to his own use, the property described in the indictment; second, that the property disposed of was mortgaged to the Farmer's Home Administration; and third, that Dobbs acted with intent to defraud the FmHA. *United States v. Garth,* 773 F.2d 1469, 1477 (5th Cir.1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2246, 90 L.Ed.2d 693 (1986).

At trial, Robert Love, who was county supervisor for the FmHA, testified that Dobbs had agreed in writing to obtain the FmHA's permission before selling any cattle. He also stated that selling the entire herd in a cow-calf operation was a significant event because without the base herd no income could be produced for loan repayment. Marvin McPherson, who was the assistant county supervisor, also testified that Dobbs had signed loan agreements in which he had agreed to inform the FmHA of any sale of collateral. He also testified that he never gave Dobbs permission to sell any of the FmHA's collateral. McPherson also showed an exhibit where Dobbs had gotten permission from the FmHA to sell cattle in the past.

Kay Dodson, who was the county clerk, testified that if Dobbs had permission from the FmHA to sell cattle there would have been a form 1962–1 in his loan file, detailing how much cattle he could sell. She also testified that there was no form 1962–1 in his file for the period covering January of 1991 to August of 1992. David Dumon, who became County Supervisor in 1992 after Love, admitted that Dobbs could have gotten the FmHA's permission to sell some cattle to pay essential family expenses or ranch operating expenses had such a request been made. However, such a request was not made to his knowledge. John Mayberry, district director of the FmHA, stated that the basic policy of the government on obtaining the permission to sell collateral has been the same since at least 1971.

Dorothy Gibbs, owner of Bonham Livestock testified that Dobbs sold almost 200 head of cattle at her sales barn. She testified that in one instance, she made out a check to Dobbs and the FmHA and he became very upset. He cajoled her into writing a new check to him alone. Toni Gould, an agent of the Inspector General Office of the Department of Agriculture, testified that based on a conservative estimate, Dobbs sold 1086 head of cattle between January of 1991 and August of 1992. According to his loan documents, he was supposed to have only a maximum of 667 head of cattle. He also testified that Dobbs was buying and selling cattle as if he was gambling to make a short term profit.

Larry Dobbs testified that he thought that he had the permission of the FmHA to sell the cattle. He stated that he had gotten McPherson's permission to sell the cattle. He also testified that McPherson had given him a blank 1962–1 form and he had filled out the form and sent it to the FmHA.

Upon careful review of the record, we conclude that there is sufficient evidence in the record from which a rational trier of fact could find that Dobbs acted with intent to defraud the FmHA. There was evidence that Dobbs had been informed of the reporting requirement, that he was aware of it, and that he had complied with the reporting requirement in the past. At least once, Dobbs actively sought to exclude the FmHA as a payee on checks issued in connection with these sales. Dobbs also waited until the FmHA was about to make a collateral inspection before informing it that he had sold the cattle. From this evidence, a rational trier of fact could infer that Dobbs wanted to deceive the FmHA as to the condition of its security (the cattle) in order to convert the value of the security to his own use.

Dobbs argues emphatically that the FmHA had given him the right to sell the cattle and that the government should be estopped from arguing that it had not authorized the sale of cattle. As noted above, various FmHA officials denied that they gave Dobbs permission to sell the mortgaged cattle. Adopting Dobbs' contention would require us to make a credibility determination between him and the FmHA officials. Because the record amply supports the jury's construction of the evidence, we reject Dobbs' claim.

## II. BANK FRAUD CONVICTIONS

Dobbs contends that there was insufficient evidence to convict him in Counts 2 and 3 of devising a scheme to defraud the Honey Grove Branch of Farmer's and Merchants Bank (F & M) of bank fraud. In order for the government to convict Dobbs of bank fraud, it must prove that Dobbs knowingly executed or attempted to execute "a scheme or artifice to defraud a federally chartered or insured financial institution." 18 U.S.C. § 1344(1). Dobbs argues that there is insufficient evidence in the record to prove that he had the intent to defraud.

The term "scheme to defraud" is not readily defined, *see United States v. Goldblatt*, 813 F.2d 619, 624 (3rd Cir.1987), but it includes any false or fraudulent pretenses or representations intended to deceive others in order to obtain something of value, such as money, from the institution to be deceived. *United States v. Lemons*, 941 F.2d 309, 314–15 (5th Cir.1991); *United States v. Church*, 888 F.2d 20, 23 (5th Cir.1989). The requisite intent to defraud is established if the defendant acted knowingly and with the specific intent to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to himself. *United States v. Gunter*, 876 F.2d 1113, 1120 (5th Cir.), *cert. denied*, 493 U.S. 871, 110 S.Ct. 198, 107 L.Ed.2d 152 (1989); *United States v. St. Gelais*, 952 F.2d 90, 96 (5th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 439, 121 L.Ed.2d 358 (1992) (wire fraud).

In count two of the indictment, the government alleged that between June 1991 and August 1992, Dobbs committed bank fraud by selling the cattle securing the F & M's loans without F & M's knowledge or authority. Dobbs argues that, by custom, he did not need the F & M's permission to sell the cattle. Over a twenty-year period, Dobbs had obtained numerous loans and apparently sold cattle without first notifying the bank of his intent to do so. He argues

that because he did not need the bank's permission to sell the cattle, there was insufficient evidence to prove that he had the requisite intent to defraud. We disagree.

At trial, Alvin Fields, who was the president of the Farmer's and Merchants Bank, testified that Dobbs only told him that he had sold the bank's collateral cattle when F & M was about to inspect the collateral. He also testified that Dobbs told him that he didn't have any of the money from the cattle sales because he had used the money to pay operational expenses. Fields admitted that, despite written agreements to the contrary, F & M had never insisted that Dobbs obtain the bank's permission to sell the cattle which served as collateral. He did, however, testify that his arrangement with Dobbs was that when he did sell cattle he would pay off F & M's loans with the proceeds.

Toni Gould testified that Dobbs had been buying and selling cattle continuously from January of 1991 until August of 1992, as if he was gambling. She also testified that Dobbs had sold large portions of the bank's cattle at sales barns outside of the Honey Grove area. Robert Love testified, at trial, that Dobbs had agreed, in writing in 1990, not to incur debt from anyone other than the FmHA.

We find that a reasonable jury could conclude from this evidence that Dobbs committed bank fraud by selling the cattle which secured the bank's loan to Dobbs. The FmHA's prohibition on the incurrence of other debt made Dobbs' actions in securing more debt suspect. The jury could conclude from the testimony of Fields and Gould that, in selling the cattle, Dobbs was diverting funds that properly belonged to bank into his own ranch operation. By selling the cattle outside the Honey Grove area, Dobbs sought to conceal his actions from the bank. Dobbs placed the bank at risk that its loans would not be repaid in order that he might use the proceeds as a personal stream of income. In fact, the bank lost approximately $89,000 as a result of Dobbs' unauthorized cattle sales. These actions permit the inference of intent to defraud. Intent to defraud is established if the defendant acted with the intent to deceive in order to cause financial loss to another or bring about financial gain to himself. *Gunter*, 876 F.2d at 1120. In this case, Dobbs acted with intent to deceive in order to bring about financial gain to himself at someone else's risk.

■ In count three of the indictment, the government alleges that Dobbs committed bank fraud by selling cattle which he knew was security for F & M loans to his children, Clint, Ashley, and Melanie Dobbs. Dobbs again makes the same argument that: because he was not required to seek the bank's permission to sell the cattle in the past, there is insufficient evidence from which the jury could find that he had the intent to defraud. Again, we disagree.

In addition to his testimony regarding count two, Alvin Fields testified that he personally made loans in 1991 to Dobbs' adult children to buy approximately 120 head of cattle. The purpose of the loans was to fund the children's college expenses. He said that each child came to the bank and signed for the loans and that the bank looked to them for repayment. Fields stated that he knew that Dobbs would be managing the cattle. He testified that in October of 1992, he inspected the children's collateral and found only 112 head of cattle and each of those appeared to have been recently purchased. He also discovered that even the replacement cattle had been sold to pay ranch operational expenses. The failure to use the cattle sale proceeds to pay off the children's debt left the bank facing a loss of approximately $40,-000.[3]

A part of Clint Dobbs' grand jury testimony was also read to the jury. In it, Clint Dobbs testified that, in one instance when his father sold some of his cattle in Oklahoma City, Oklahoma, he thought that his father was going to use the proceeds to pay off his bank note. He later found out that Dobbs had kept the money. Clint Dobbs' father later testified that he used the cattle proceeds to pay ranch and family expenses.

A reasonable jury could find from the evidence presented at trial that Dobbs committed bank fraud by selling his children's collat-

---

**3.** The children's debt to the bank was later set-    tled by a relative of the Dobbs.

eral cattle. As with his own cattle, Dobbs surreptitiously used money from the sale of the children's cattle to pay for ranch and family expenses. As we stated above, Dobbs' diversions put the bank at risk of loss in return for his own financial gain. From these actions, a reasonable juror could find that Dobbs had the requisite intent to defraud.

## III. MONEY LAUNDERING CONVICTIONS

Dobbs contends that there is insufficient evidence in the record to convict him of money laundering. Under the money laundering statute, 18 U.S.C. § 1956:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(B) knowing that the transaction is designed in whole or in part—

(i) *to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity;* ...

shall be sentenced to a fine ... or imprisonment for not more than twenty years, or both. [emphasis ours].

The government must prove that the specific transactions in question were designed, at least in part to launder money. *United States in Garcia–Emanuel,* 14 F.3d 1469, 1474 (10th Cir.1994). It is necessary to show a desire to create the appearance of legitimate wealth or otherwise to conceal the nature of funds so that it might enter the economy as legitimate funds. *United States v. Dimeck,* 24 F.3d 1239, 1245 (10th Cir. 1994). The purpose of the money laundering statute is to reach commercial transactions intended (at least in part) to disguise the relationship of the item purchased with the person providing the proceeds and that the proceeds used to make the purchase were obtained from illegal activities. *United States v. Sanders,* 929 F.2d 1466, 1472 (10th Cir.), *cert. denied,* 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991).

One of the money laundering counts charges that Dobbs deposited approximately $4500 of the cattle sale proceeds into his wife's bank account. The Dobbses had decided to use the account as their main operational account. The money was used to pay the ordinary expenses of the ranch and household. The other money laundering count charges that Dobbs converted a cattle sale check for approximately $37,000 into a cashiers check for $37,000 and then converted the cashiers check into four separate cashier's checks. These smaller cashiers checks were then used to pay for ranch and family expenses. The government concedes that Dobbs' records reflected use of the funds to pay ranch and family expenses. These transactions were open and notorious—at least as much as the typical bank transactions can be. Dobbs also did not use any third parties to make purchases or otherwise hide his identity when making the transactions.

In *United States v. Sanders,* 929 F.2d 1466 (10th Cir.), *cert. denied,* 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991), the defendant had been convicted of money laundering for purchasing two cars. On the first car purchase, the defendant and her husband paid a $500 cash deposit when ordering the car. When the car was delivered, Sanders paid $3535 in cash and $10,000 by credit union bank draft. On the second car purchase, the defendant traded an old Lincoln for a new one with $11,400 in cash for the trade-in difference. The defendant had the salesman put the car in her daughter's name and signed the daughter's name to the purchase agreement. The cars were conspicuously used by the defendant and her husband making the association of the vehicles with the Sanderses obvious to law enforcement.

The court held that the very purpose of the statute was to reach commercial transactions intended at least in part to disguise the relationship of the item purchased with the person providing the illegally obtained proceeds. *Id.* at 1472; *see also, United States v. Gonzalez–Rodriguez,* 966 F.2d 918, 925 (5th Cir.1992) (citing this holding in Sanders with approval). The court found that the fact the

defendant and her husband were present at the car purchases and were readily identified by the respective sales person plus the fact that the cars were used in a conspicuous manner provided an insufficient basis to support a conviction for money laundering. *Sanders,* 929 F.2d at 1472–73. Similarly in this case where the use of the money was not disguised and the purchases were for family expenses and business expenses is not disputed, there is also insufficient evidence to support the money laundering conviction.

The government argues that evidence in the record showing that Dobbs did not disclose these transactions to the bank or to his bankruptcy attorney provides a reasonable basis for the jury to find that the transactions were designed to conceal the origins of the funds. We disagree. This evidence in the record only provides a basis for showing that the defendant was engaged in some type of fraud. There is no link between this evidence of fraud and these specific transactions, *Garcia–Emanuel,* 14 F.3d at 1474, or that the transactions were done to disguise the relationship between Dobbs and the proceeds. *Sanders,* 929 F.2d at 472.[4] As stated by the Tenth Circuit in *Garcia–Emanuel,* "[m]erely engaging in a transaction with money whose nature has been concealed through other means is not in itself a crime." 14 F.3d at 1474.

## IV. EVIDENTIARY CHALLENGE

■ Dobbs contends that the district court erred in admitting into evidence summaries of the loans to Dobbs' children. These summaries showed that the bank had suffered a $40,000 loss. Dobbs argues that these summaries were incomplete because $31,000 had been paid to the bank as a settlement of the debt and the settlement was not reflected in the summary. Under Fed.R.Evid. 403, evidence may be excluded from trial if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading to the jury. The district court's decision to admit evidence is reviewed for an abuse of

discretion. *Williams v. Chevron, U.S.A., Inc.,* 875 F.2d 501, 504 (5th Cir.1989).

We find no merit in this contention. The district court allowed the admission of the loan summaries into evidence specifying that they were only accurate as to June 22, 1992. Pursuant to Fed.R.Evid. 1006, the contents of voluminous financial documents may be presented in the form of a summary. With the limitation imposed upon the exhibit by the district court, the loan summaries were neither inaccurate or incomplete. We find no abuse in the district court's discretion in admitting the loan summaries.

## V. CHALLENGE TO THE DISTRICT COURT'S CONDUCT

■ Dobbs contends that the district court participated in trial during the examination of his witnesses as to be a partisan for the government. In determining whether a district court overstepped the bounds of acceptable judicial conduct, the Court must view the proceedings as a whole. *United States v. Williams,* 809 F.2d 1072, 1089 (5th Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 228, 98 L.Ed.2d 187 (1987).

■ We have examined the portions of the record referred to by the defendant and the record in its entirety. A careful reading of the record reveals that the district court took an active role during the trial often interjecting comments and questions on both sides of the case. A federal district court may comment on the evidence, question witnesses, bring out facts not yet adduced, and maintain the pace of the trial by interrupting or setting time limits on counsel. *United States v. Wallace,* 32 F.3d 921, 928 (5th Cir.1994). In this case, the questions and comments made by the court served to clarify confusing lines of questions and contentions offered by both counsels and witnesses. We find no merit in this contention.

## CONCLUSION

For the foregoing reasons, we REVERSE both of Dobbs' convictions for money laun-

---

4. Because we have reversed the money laundering convictions, we do not address the other challenges made to the convictions.

dering. Dobbs' convictions for bank fraud and for fraudulently disposing of FmHA collateral are AFFIRMED.

EMILIO M. GARZA, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority opinion, except Part III—the money laundering convictions. As the majority points out:

> One of the money laundering counts charges that Dobbs deposited approximately $4500 of the cattle sale proceeds into his wife's bank account. The Dobbs had decided to use the account as their main operational account. The money was used to pay the ordinary expenses of the ranch and household. The other money laundering count charges that Dobbs converted a cattle sale check for approximately $37,000 into a cashiers check for $37,000 and then converted the cashiers check into four separate cashier's checks. These smaller cashiers checks were then used to pay for ranch and family expenses.

Majority op. at 5668.

Both *United States v. Garcia–Emanuel*[5] and *United States v. Sanders*,[6] two Tenth Circuit cases on which the majority heavily relies, are money laundering cases stemming from drug sales. The issue in both cases was whether "the transactions were structured to conceal Defendant's identity." The court in those cases was struggling to distinguish between mere money spending and money laundering. The facts of *this* case are significantly different. The *identity* of the defen-

---

**5.** 14 F.3d 1469 (10th Cir.1994).

**6.** 929 F.2d 1466 (10th Cir.), *cert. denied*, 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991).

**7.** The section states as follows:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity ... knowing that the transactions is designed in whole or in part ... to conceal or disguise the *nature*, the location, the *source*, the ownership, or the control of the proceeds....

18 U.S.C. § 1956(a)(1) (1988) (emphasis added).

---

dant is not at issue here; however, the *source* of the money is because the cattle that were sold were mortgaged to the bank.

Section 1956 of Title 18 not only prohibits any financial transaction involving the proceeds of unlawful activity designed in whole or in part to conceal the *ownership* but also the *source* of the specified activity.[7] Indeed, other defendants have made the same argument that Dobbs makes; that is, that Dobbs' open association with the transactions and the proceeds negates the intent element of the money laundering statute. The courts in those cases, however, rejected the defendants' argument, because "§ 1956(a)(B)(i) does not require an attempt to conceal the identity of the defendant; a scheme that conceals only the source of the funds falls within the purview of the statute." *United States v. Kinzler*, 55 F.3d 70, 73 (2d Cir. 1995).[8] Indeed, the Tenth Circuit itself has explicitly limited *Sanders'* holding to apply in cases in which the defendant's identity was at issue, but not in cases in which the defendant sought to hide the source of the proceeds:

> In *Sanders* we noted that, according to the legislative history, Congress intended that the money laundering statute "*include* transactions designed to conceal the identity of the participants to the transaction." ... We find no requirement in the statute or in *Sanders* that every money laundering conviction must be supported by evidence of intent to conceal the identity of the participants to the transaction. Even though the defendant made no efforts to conceal his identity ..., the evidence suffi-

---

**8.** *Accord United States v. Manarite*, 44 F.3d 1407 (9th Cir.) (rejecting argument that money laundering statute required intent to conceal identity and holding that attempts to conceal source of proceeds satisfied intent element), *cert. denied*, —— U.S. ——, 115 S.Ct. 2610, 132 L.Ed.2d 854 (1995); *United States v. Dimeck*, 24 F.3d 1239, 1246 (10th Cir.1994) (explaining that purpose of statute is to focus on "characteristics which, when concealed or obliterated, allow illegal proceeds to be passed into commerce as legitimate proceeds more easily"); *United States v. Alford*, 999 F.2d 818, 824 (5th Cir.1993) (holding that intent element is shown if transactions were for "the purpose of disguising the nature, location and control of the proceeds"); *Hollenback v. United States*, 987 F.2d 1272, 1278 (7th

ciently supports the inference that a concealment occurred in another sense. The [transaction] was designed to conceal the illegal source of the proceeds from those who would likely expose the defendant's underlying fraudulent activities.

*United States v. Lovett,* 964 F.2d 1029 (10th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 169, 121 L.Ed.2d 117 (1992).[9]

Accordingly, the conclusion that there is insufficient evidence of money laundering based solely on evidence that "the *use* of the money was not disguised and purchases were for family expenses and business expenses" is not on target. I therefore question whether evidence that the "undisguised use" of the money is probative of Dobbs's intent to conceal the source of the unlawful activity—the sale of mortgaged cattle whose proceeds belonged to the bank—which is the material issue before us. In my view, the concealment on which we should focus is not the identity of the defendants as in *Garcia–Emanuel* and *Sanders,* but the source of the money deposited into the Dobbs's bank accounts. Accordingly, because the cattle sales created proceeds of an unlawful activity,[10] we must focus on what he did after these sales.

In one count, Dobbs' attempt to conceal the source of these proceeds by purchasing the $37,000 cashier check without the name of the remitter (the cattle barn) is, in my opinion, probative of money laundering. The combination of that act with changing that check into four separate checks of lesser amounts to hide the total amount of the cattle sale is, in my opinion, sufficient for conviction. *See United States v. Willey,* 57

F.3d 1374, 1385 (5th Cir.1995) (noting that series of unusual financial moves supports finding of intent to conceal); *Hollenback v. United States,* 987 F.2d 1272, 1279 (7th Cir. 1993) (stating that deposits and payments in small amounts rather than entire sum satisfied intent element because payments were "irregularly structured transactions that were calculated to mislead observers as to the size of the transactions and the actual nature of the funds used").

In the other count, whether placement of money from cattle sales proceeds into Dobbs' wife's account is probative of money laundering is a closer question. At least, the deposit of these proceeds into his wife's account was unusual under the facts of this case. The Eighth Circuit as well as our own has found deposits into an account other than the defendant's personal account sufficient to show an intent to conceal. *See United States v. Willey,* 57 F.3d at 1385–86 (noting that deposits into business account support finding of intent to conceal); *United States v. West,* 22 F.3d 586, 591 (5th Cir.) (holding that deposits of illegal proceeds into girlfriend's account satisfied money laundering statute), *cert. denied,* — U.S. —, 115 S.Ct. 584, 130 L.Ed.2d 498 (1994); *United States v. Sutera,* 933 F.2d 641, 648 (8th Cir.1991) (holding that deposit of proceeds of gambling into business account sufficed to support intent to launder money); *cf. United States v. Peery,* 977 F.2d 1230, 1234 (8th Cir.1992) (holding that defendant's transfers between accounts satisfied intent element even though identity not concealed), *cert. denied,* — U.S. —, 113 S.Ct. 1354, 122 L.Ed.2d 734 (1993).[11]

Cir.1993) (stating that statute covers more than intent to hide identity).

9. The court clarified further:

To find that the money laundering statute is aimed solely at those transactions designed to conceal the identity of the participants to the transaction is to ignore the broad language of the statute.... In short, the money laundering statute is not aimed solely at commercial transactions intended to disguise the relationship of the item purchased with the person providing the proceeds; the statute is aimed broadly at transactions designed in whole or in part to conceal or disguise *in any manner* the nature, location, source, ownership or control of the proceeds of unlawful activity.

*Lovett,* 964 F.2d at 1034 n. 3.

10. *See United States v. Edgmon,* 952 F.2d 1206, 1209–10 (10th Cir.1991) (stating that improper sale of FmHA-mortgaged cattle created "proceeds of an illegal activity"), *cert. denied,* — U.S. —, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992); *cf. United States v. West,* 22 F.3d 586, 591 (5th Cir.) (holding that transactions underlying bankruptcy fraud produced "proceeds of unlawful activity"), *cert. denied,* — U.S. —, 115 S.Ct. 584, 130 L.Ed.2d 498 (1994).

11. Moreover, the evidence as a whole supports a finding of intent on this count. *See Willey,* 57 F.3d at 1386 ("[I]t is not necessary to prove with regard to any single transaction that the defendant removed all trace of his involvement with the money or that the particular transaction charged is itself highly unusual ... [and] it is not necessary that a transaction be examined wholly

A close examination of even *Garcia–Emanuel* and *Sanders*, on which the majority relies, supports the conviction rather than the acquittal of Dobbs. The majority correctly points out that in Counts 9 and 10 of *Garcia–Emanuel*, the defendant withdrew $9,000 in drug money from his bank account to purchase a cashier's check on which he was named remitter to make payment on a residential mortgage. 14 F.3d at 1476. The Tenth Circuit held that this use of a cashier's check was insufficient to prove concealment. *Id.*[12] Clearly, most of these transactions fall under the category of "money spending" as opposed to "money laundering," but this is because the defendant's *identity* was the item that had to be concealed.

In Count 11, however, the court held that the purchase of some land with a cashier's check on which the defendant's restaurant was listed as remitter was sufficient documentary evidence to support a finding of deception. *Id.* at 1476–77.[13] In Count 13, the defendant first bought a CD with cash then used the CD as collateral for a loan to an insurance company he partially owned. This was described by the court as "classic money laundering" because the defendant "through a complex series of transactions, transform[ed] the cash he received selling drugs into a legitimate business investment. . . ." *Id.* at 1477. This is a similar scheme to that which Dobbs used to hide the source of the cattle sales proceeds in this case.

In *Sanders*, the defendant used drug money to purchase two vehicles. 929 F.2d at 1471. "The Sanderses personally handled the transaction to purchase the Volvo and were readily identified by the salesperson with whom they dealt." *Id.* This transaction was described as a " 'normal cash transaction.' " *Id.* Although the Sanderses placed title of the Lincoln in their daughter's name, they traded in their old car .and paid the difference in cash. "All three of the Sanderses were readily identified by the Lincoln salesperson with whom· they dealt." *Id.* Furthermore, "[b]oth the Volvo and the Lincoln were conspicuously used by the Sanderses." *Id.* The Tenth Circuit again held that the evidence was insufficient to support a conviction, although it stated that the Lincoln purchase "presents a closer case," because one might infer an intent to hide behind the daughter's identity. *Id.* at 1472. In this case, Dobbs placed the proceeds of the four unmarked checks in his wife's bank account—a course of action unlike his previous handling of cattle sales checks; this change of method is probative of concealment. Thus, I would affirm the conviction on this count.

In summary, Dobbs' eventual use of the funds may have been "open and notorious," majority op. at 5668, but that does not answer the question of whether the manner in which he moved the funds to his accounts demonstrated an intent to conceal the source

---

in isolation if the evidence tends to show that it is part of a larger scheme that is designed to conceal illegal proceeds.").

**12.** The court's conclusion on other counts was the same. In Count 12, he made a second payment on some land, again using a cashier's check on which he was named as remitter. Again the court held that this evidence was insufficient. Ĩn Count 14, Defendant made no effort to conceal a $15,000 partial cash payment for a Paso Fino horse. In Count 22, he made a similar payment as in Count 14. In Counts 18, 19, 20, 24 and 25, he purchased horses and other horse paraphernalia with cash or checks on which his name appeared. In count 21, again there was insufficient evidence of money laundering because Garcia appeared as the remitter. Lastly, in Count 23, $4,400 wired by Garcia to a Florida bank account of a Columbian national without evi-

dence "of an unusual structure to the transaction, of undue secrecy surrounding it, or of any attempt to avoid attention" was insufficient upon which to convict. *Id.*

**13.** Indeed, in Count 15, Garcia's wife purchased another Paso Fino horse drawing a $20,000 check from a joint checking account in which three separate checks in the amounts of $7,000, $8,000, and $8,000 had been deposited the week before. Although a straight (B)(ii) case, the government prosecuted the case under (B)(i). Although the court stated that "[t]he inference under this theory, that the design to conceal in the first transaction (the purchase of the cashier's check) can be imputed to the second (the purchase of the horse), is considerably weaker," the court nevertheless held that "this is evidence of a design to conceal." *Id.* at 1477.

of those funds—the improper sale of cattle.[14] I am simply not convinced that the Government did not prove its case on these money laundering charges. Accordingly, I respectfully dissent from the reversal of Dobbs' money laundering convictions.

---

**14.** Indeed, Dobbs' "open and notorious" use may show that he was an inept money launderer, but it does not necessarily negate the conclusion that he laundered money. *See Sutera,* 933 F.2d at 648 ("While the money might have been better hidden ..., the money laundering statute does not require the jury to find that [the defendant] did a good job of laundering the proceeds.").

