REVISED - March 7, 2001

UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

_____

No. 99-50669

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HUGH VON MESHACK; LAWAYNE THOMAS; LINDA
PARKER; TERRENCE IAN HODGES, also known as Guda,

Defendants-Appellants.

Appeal from the United States District Court
For the Western District of Texas

August 28, 2000

Before JOLLY, HIGGINBOTHAM, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Hugh Von Meshack, Lawayne Thomas, Linda Parker, and Terrence Ian Hodges appeal their

convictions and sentences. We affirm in part, vacate in part, and remand in part.

# I

In 1992, the Drug Enforcement Administration Heart of Texas Task Force ("DEA") and the Coryell County Sheriff's Department began a joint investigation of what was believed to be a "crack" cocaine trafficking organization based in Temple, Texas. The investigation eventually focused on a Temple restaurant known as Meshack's Bar-B-Que and its proprietor, Hugh Von Meshack. Investigators believed Meshack to be the leader of an organization which purchased crack and powder cocaine and marijuana near Houston and distributed it at Meshack's Bar-B-Que and other locations in Temple. Suspicions were confirmed when confidential government informants made several drug purchases at the Bar-B-Que. While Meshack himself refused to sell directly to one informant, Meshack directed the informant to his son, Terrence Hodges, and watched the deal take place.

Over the years, the task force began to accumulate evidence against Meshack and many customers and employees of his Bar-B-Que. In 1997, several individuals arrested in central Texas for possession of various controlled substances identified Meshack's Bar-B-Que and several of its employees as the source of their drugs. The arrestees told task force officials that they had purchased crack cocaine, powder cocaine, and marijuana at the Bar-B-Que and had either received the drugs at the Bar-B-Que or had it delivered to other locations in Temple. They identified Meshack as the primary drug distributor and claimed that they made their purchases from either him, Hodges, or Bar-B-Que employee Larry Smith.

Eventually, participants in Meshack's drug ring began to turn on the organization. Wayne Hatcher was the first. Initially debriefed by the government on July 9, 1997, Hatcher told officials that crack cocaine was dealt from Meshack's Bar-B-Que and that Meshack was the "main man."

Hatcher told authorities that Meshack ran the organization, and that he, Hodges, Linda Parker (Meshack's girlfriend), and Lamont Bailey worked directly under Meshack. Hatcher also informed officials that several individuals, among them Bethel Kelly, would drive to Houston weekly to purchase kilograms of cocaine for Meshack which were eventually distributed from Meshack's Bar-B-Que. Kelly, debriefed by officials on August 11, 1997, confirmed Hatcher's story and named others involved in distributing the crack cocaine that he brought to Meshack.

Several others followed Hatcher's lead and informed on Meshack and other members of his organization. Montonyua Waller, Anthony Dailey, Albert Taplin, Skyler Newsome, Lamont Bailey, Andre Moore, Larry Smith, Frank Alcorn, and Lee Odis Ford all separately informed task force officials that Meshack ran a crack cocaine distribution organization from the Bar-B-Que primarily through Parker and Hodges. These informants thoroughly described the details of the organization, which the task force confirmed through investigation.

At the conclusion of the investigation, the government indicted Meshack and eleven codefendants on various charges in a fourteen-count indictment. Significantly, although most of these were drug charges, no count of the indictment specified the amount of drugs for which each charged defendant was responsible.

Many of those indicted agreed to plead guilty in exchange for their testimony against the remaining conspirators. By the time the case went to trial, charges remained only against Meshack, Parker, Hodges, Lawayne Thomas, and Chester White. Many of the other conspirators, including Hatcher, Michael Peoples, Moore, Bailey, Isiah Walker, Smith, Kelly, and Waller testified at trial, detailing the many drug-related activities run from Meshack's Bar-B-Que.

At the conclusion of trial, the jury found Meshack, Hodges, and Parker guilty of conspiracy

to possess crack cocaine with intent to distribute in violation of 21 U.S.C. § 841(a) (count 1).[1]

Meshack was alone found guilty of maintaining a place for the unlawful distribution of crack cocaine in violation of the "crackhouse statute," 21 U.S.C. § 856 (count 2), aiding and abetting the possession of crack cocaine found in Hodges's and Parker's apartments in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (counts 4 and 5), and possession with intent to distribute marijuana found in a search of the Bar-B-Que (count 7). Hodges was also found guilty of possession with intent to distribute marijuana (count 8). Thomas was found guilty of possession of crack cocaine with intent to distribute (count 11). Meshack and Parker were also found guilty of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956 (count 14).

The trial judge then conducted individual sentencing hearings for each defendant, at which he determined, by a preponderance of the evidence, the amount of drugs for which each defendant was responsible. For Meshack's conspiracy and for one of his aiding and abetting convictions, the trial judge found that Meshack was responsible for more than 50 grams of crack cocaine. Because Meshack had been convicted of two prior felony drug convictions, the trial judge sentenced him to concurrent terms of life imprisonment with 10 years of supervised release on each count.[2] *See* 21 U.S.C. § 841(b). Meshack's other sentences and terms of supervised release, the largest of which

---

[1]     Thomas and White were found not guilty on this charge and, given that it was the only count naming White as a defendant, White was released.

[2]     At sentencing, Meshack had argued that the government's calculation of the amount of drugs attributable to him—1,593,520 kilograms of marijuana and over 22,000 kilograms of crack cocaine—was based on exaggerated testimony from unreliable co-conspirators. However, the trial judge was persuaded by the government's argument that, "because of the provisions of § 841(b) and Mr. Meshack's previous Criminal History, with two drug felonies, which the Government gave notice of pre-trial . . . if he was found in excess of 50 grams, it would be a mandatory life sentence." Accordingly, while the trial judge did not find an exact amount of crack cocaine attributable to Meshack, it did find that the amount exceeded 50 grams.

-4-

was thirty years, would be served concurrently with the life sentences.[3] Meshack was also fined a total of $30,000 and given a special assessment of $600.

Parker, as described above, was found guilty of two crimes, conspiracy to possess crack cocaine with intent to distribute and conspiracy to commit money laundering. The trial judge found that the amount of crack cocaine attributable to Parker for her conspiracy conviction "would exceed one and a half kilograms," making her statutory maximum life imprisonment, see 21 U.S.C. § 841(a)(1), and giving her a base offense level of 38, see U.S.S.G. § 2D1.1(c)(1). Because Parker had little criminal history, her guideline range was 235 to 293 months, and the judge sentenced her to 235 months imprisonment and 5 years of supervised release for that conviction. The judge also sentenced Parker to a concurrent 235 month sentence and 3-year term of supervised release for her money laundering conviction. See U.S.S.G. §§ 2S1.1(a)-(b), § 3D1.1.[4] Parker was also fined $1,500 and specially assessed $200.

Thomas was sentenced for the only crime of which the jury found him guilty, possession of crack cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1). At sentencing, the government called a witness, officer Gary Medford, in an attempt to clarify the amount of crack cocaine the court should attribute to Thomas. Over the defendant's objections, the court held that

---

[3]     On count 5, which required no finding of responsibility for a certain quantity of drugs, because of his prior offenses Meshack was sentenced to 30 years in prison and 6 years supervised release. See 21 U.S.C. § 841(a)(1)(C). For his count 7 conviction for possession of marijuana with intent to distribute, Meshack received a 10 year prison sentence and 4 years of supervised release. See U.S.C. 841(b)(1)(D). Meshack was also sentenced to 20 years in prison and 3 years supervised release for his count 2 conviction under the "crackhouse" statute, see 21 U.S.C. § 856(b), and 130 months in prison and 3 years supervised release for money laundering, see 18 U.S.C. § 1956(a)(1). For each of these convictions, since the statutorily authorized sentence was less than the minimum under the guidelines, the PSR reported that "the statutorily authorized maximum sentence shall be the guideline sentence." See U.S.S.G. § 5G1.1.

[4]     At the time, Parker was already serving a 10-year sentence on another drug charge, and the judge ordered the sentences imposed in this case to be served concurrently with the prior 10-year sentence.

-5-

the evidence was "sufficiently reliable to be used as relevant conduct, and the proper amount . . . would be the 245.73 grams set forth in the Pre-Sentence Report."  Based on the judge's finding of that amount, the appropriate base offense level was 34, *see* U.S.S.G. § 2D1.1(c)(3), and based on Thomas's criminal history level of II, the appropriate guideline range was 168 to 210 months.  The trial judge sentenced Thomas to 168 months imprisonment, five years of supervised release, a $2,000 fine, and a $100 special assessment.

Hodges was convicted on two counts, conspiracy to possess crack cocaine with intent to distribute and possession of marijuana with intent to distribute.  At sentencing, Hodges challenged the amount of drugs attributable to him, but the judge accepted the calculation in the PSR, which attributed a substantial amount of cocaine and marijuana to Hodges.[5]  Based on this amount, the statute provided a maximum life term with a mandatory minimum of 20 years for the conspiracy conviction.  *See* 21 U.S.C. § 841(b)(1)(A).  The guidelines provided a base offense level of 38, *see* U.S.S.G. § 2D1.1(c)(1), and based on Hodges's criminal history category of IV, the applicable guideline range was 324 to 405 months.  Accordingly, the trial judge sentenced Hodges to 324 months imprisonment and 10 years of supervised release for conspiracy to distribute crack cocaine.  On the marijuana conviction, again based on the finding of a substantial amount of marijuana, the trial judge sentenced Hodges to concurrent terms of 10 years in prison, the maximum authorized under 21 U.S.C. § 841(b)(1)(D), and four years of supervised release.  Hodges was also fined $2,500, and specially assessed $100, on each conviction.

Meshack, Parker, Thomas, and Hodges now appeal.

---

[5]     The PSR claimed that Hodges "can be held personally accountable for at least 1.99 kilograms of 'crack' cocaine; 3.02 kilograms of powder cocaine; and 4.08 kilograms of marijuana, which converts to a total marijuana equivalency of 40,441.72 kilograms."

## II

We first review the defendants' various challenges to the sufficiency of the evidence underlying their convictions. We view all of the evidence in the light most favorable to the verdict, drawing all inferences in its favor, and we cannot reverse unless "no rational trier of fact could find substantial evidence establishing the defendants' guilt beyond a reasonable doubt." *United States v. Lee*, 217 F.3d 284, 288 (5th Cir. 2000).

### A

Several defendants challenge the sufficiency of the evidence used to convict them of conspiracy to distribute crack cocaine. To convict, the government needed to prove: (1) the existence of an agreement to violate the drug laws that each co-conspirator (2) knew of, (3) intended to join, and (4) voluntarily participated in. *See United States v. Westbrook*, 119 F.3d 1176, 1189-90 (5th Cir. 1997). Co-conspirators need not know all of the details of the enterprise so long as they "knowingly participate[] in some fashion in the larger objectives of the conspiracy." *Id.* We review the evidence in the light most favorable to the jury's verdict, and in light of our holding that "[a]s long as it is not factually insubstantial or incredible, the uncorroborated testimony of a co-conspirator, even one who has chosen to cooperate with the government in exchange for non-prosecution or leniency, may be constitutionally sufficient evidence to convict." *Id.*

### 1

Meshack argues that the evidence was insufficient to convict him of conspiracy to distribute crack cocaine. However, the evidence implicating Meshack in the crack cocaine conspiracy was

voluminous.[6]  First, Hatcher testified that when he needed drugs, he would call Meshack at work or meet him at the Bar-B-Que.  While Meshack sometimes handed him the drugs directly, on other occasions, usually after Hatcher had already paid for the drugs,[7] the drugs were dropped off near a fire hydrant, or delivered by Meshack or Parker at a gas station, car wash, or grocery store.

LaMont Bailey's testimony showed another method by which dealers could place drug orders with Meshack.  As he testified, he would call the Bar-B-Que and ask Meshack for "a slab of ribs," which Meshack knew was code for an ounce of crack cocaine.  If he desired the powder form of cocaine, Bailey would ask Meshack for "undone ribs."  Bailey testified that he would usually pay for the drugs by presenting the money to Meshack at the Bar-B-Que, and he corroborated Hatcher's testimony that the drugs were often delivered by Meshack or Parker outside a car wash.

Larry Smith testified that he frequently went to the Bar-B-Que to see Meshack and arrange for the purchase of crack cocaine.  He also testified that he introduced many people who desired to make similar purchases to Meshack.  This testimony was confirmed by Michael Peoples, who added that after he was introduced to Meshack by Smith, because Meshack felt uncomfortable selling to him directly, Peoples would merely give his money to Smith and watch Smith purchase the drugs from Meshack "on the side" of the Bar-B-Que.  A similar arrangement was apparent between Meshack and Waller.  Waller testified that he would approach Meshack in the Bar-B-Que and give him a large sum

---

[6]        Meshack argues that all of the government witnesses lacked credibility because they were "crackheads," their testimony lacked specificity, and their testimony was tainted by deals from the government.  All of these arguments, however, were presented to the jury, and the credibility determination was for it, not us.  *See United States v. Brown*, 217 F.3d 247, 254 n.4 (5th Cir. 2000).

[7]        Hatcher sometimes paid in advance for his drug purchases.  For example, Hatcher testified that Meshack allowed him to pay for drugs on several occasions by cashing checks at the Bar-B-Que.  However, Meshack also frequently gave Hatcher drugs on credit.  Hatcher testified that on one occasion, Meshack allowed him to use a car he had recently purchased as collateral for a loan used to purchase drugs.  Hatcher also testified that the $4,300 found in his home during a police search was money owed to Meshack for drugs he had been "fronted."

of money in a brown paper bag. When Waller later returned to the Bar-B-Que, Hodges delivered his purchase of crack cocaine.

While the above evidence conclusively established Meshack's role in distributing the crack cocaine through the Bar-B-Que, the testimony of Bethel Kelley established how Meshack acquired the drugs for his organization. Kelley testified that, at pre-arranged times, he would arrive at the Bar-B-Que and meet with Hodges. Hodges would retrieve large sums of cash from Meshack and give the funding to Kelley. Kelley then brought the money to LaMarque, Texas, and purchased the drugs for Meshack. Kelley testified that this occurred between twelve and fourteen times.

All of this evidence was supplemented by the testimony of government accounting expert Steve Pennington, who thoroughly investigated the finances of Meshack's Bar-B-Que and the rest of Meshack's life and found, in a "very conservative" estimate, that Meshack's income was supplemented by $170,000 from an unknown source outside the Bar-B-Que. While Meshack argued at trial that this represented gambling winnings, the jury was entitled to infer from all of the above evidence that Meshack's extensive drug ring provided the source of his wealth. Therefore, we find sufficient evidence to sustain Meshack's conviction for conspiracy to distribute crack cocaine.

**2**

Parker makes a similar challenge to her conviction for conspiracy to distribute crack cocaine. This challenge fails in light of the substantial evidence implicating her in the conspiracy. First, a search of Parker's apartment found a large sum of crack cocaine, much of it in small plastic bags which a government expert testified was in a form ready for distribution, as well as a type of scale commonly used in preparing crack cocaine for sale. Second, Christi Garza, who worked at Parker's apartment complex, testified that people came in and out of Parker's apartment at all hours of the

night, and that twice a week a man fitting Meshack's description would pick Parker up in front of her apartment, drive around in a Ford truck for an hour, and reappear with Parker carrying a large paper bag. Third, Hatcher and Bailey testified that Parker frequently delivered their crack cocaine at various locations in Temple (including a car wash) using many different rental cars. Credit card receipts found at Parker's apartment showed that Meshack funded the rentals, which were made in both Meshack and Parker's names. This evidence is clearly sufficient to implicate Parker in the conspiracy.

## B

Several defendants also challenge the sufficiency of the evidence on their convictions for possession of marijuana with the intent to distribute. "A conviction for the offense of possession of marijuana with intent to distribute requires proof that the defendant (1) knowingly (2) possessed marijuana (3) with intent to distribute it." *United States v. Cano-Guel*, 167 F.3d 900, 904 (5th Cir. 1999). Knowledge and intent, difficult to prove by direct evidence, can be inferred from the circumstances. *See United States v. Payne*, 99 F.3d 1273, 1279 (5th Cir. 1996) (citing *United States v. Rodriguez*, 993 F.2d 1170, 1175 (5th Cir. 1993)).

## 1

Hodges challenges the sufficiency of the evidence presented to convict him of possessing marijuana with intent to distribute.[8] When Hodges's apartment was searched, police found: (1) a box under the bathroom sink containing 44.6 grams of marijuana and an assortment of small plastic bags, (2) 286.2 grams of marijuana in a bag under a love seat in Hodges's living room, (3) 45 grams of

---

[8] Hodges does not challenge the sufficiency of the evidence underlying his conviction for conspiracy to distribute crack cocaine.

marijuana split up into several plastic bags elsewhere in the apartment, (4) 342.9 grams of marijuana found in Cynthia Parker's vehicle, which was parked on Hodges's premises, and (5) 107.7 grams of marijuana, found during the search in a location which is unclear from the record.[9] Hodges argues that this small amount of marijuana, combined with the small plastic baggies commonly used to distribute marijuana, is insufficient to support a finding of intent to distribute; rather, Hodges claims, the evidence is more consistent with an intent to use the marijuana personally.

We disagree. Hodges is correct that the amount of marijuana found, slightly over one pound, can be consistent with personal use and, therefore, does not in and of itself raise an inference of intent to distribute. *See United States v. Hunt*, 129 F.3d 739, 742 (5th Cir. 1997). However, the other evidence present here is sufficient to raise such an inference. First, government witnesses testified that drug paraphernalia found at Hodges's apartment, namely the small plastic baggies (some of which were filled with small amounts of marijuana), were consistent with an intent to distribute. Second, many other witnesses, including Peoples, Andre Moore, and Smith, testified that they frequently purchased marijuana from Hodges, and Isiah Walker testified that on one occasion he introduced Hodges to an individual named "Buddy" from whom Hodges could purchase marijuana in large quantities. Waller further testified that he had bought marijuana from Hodges at Hodges's apartment complex, from where he dealt "hand to hand." Combined, the evidence that Hodges was a frequent drug dealer and the evidence that he possessed both drugs and the containers frequently used to deal was sufficient for the jury to find that he possessed the marijuana with the intent to

---

[9]    Hodges claims that the record does not show exactly how much marijuana was present inside the various parts of his apartment. This is untrue. At trial, the government first introduced the testimony of Jay Eubanks, a DEA officer who conducted the search. Eubanks testified to exactly where the various marijuana sources were found; when he so testified, the government introduced the various containers of marijuana as exhibits. Later, DEA chemist George Lester testified to the exact quantity in each container.

distribute it.  *See Payne*, 99 F.3d at 1279 (5th Cir. 1996) ("While the amount of drugs possessed is admittedly small, the jury could infer intent to distribute from the fact that [appellants] regularly dealt crack out of [their] house, the location where the drugs were found.").

**2**

Meshack argues that the evidence was insufficient to find he possessed marijuana with intent to distribute it and similarly insufficient to convict him of either of two counts of aiding and abetting the possession of crack cocaine with intent to distribute.  We disagree.

One aiding and abetting conviction stemmed from a valid search of Parker's apartment conducted on August 4, 1997.  In a suitcase inside a closet, officers found 83.1 grams of crack cocaine.  Elsewhere in the apartment, several small containers of marijuana residue were found, as were a set of scales commonly used in the dilution of drugs for resale.  When questioned during the search (following proper *Miranda* warnings), Parker told the officers that she was Meshack's girlfriend and that Meshack had provided her everything, including her apartment, all associated expenses, and her car.

To prove aiding and abetting, the government "must show that the particular defendant became associated with, participated in, and in some way acted to further the distribution of crack cocaine alleged in the particular count of the indictment."  *United States v. Reliford*, 210 F.3d 282, 289 (5th Cir. 2000).  The evidence presented at trial, including Parker's comments to the police, the substantial testimony linking Meshack and Parker as partners in crime, and the testimony of Garza establishing Meshack's questionable conduct with respect to the apartment, was sufficient evidence from which the jury could have found that Meshack aided and abetted Parker's possession of the substantial amount of crack cocaine with intent to distribute it.  Meshack's argument—that the link

between he and Parker was established only by the testimony of "criminals"—is relevant to the weight of the evidence present to support the conviction, not its sufficiency. This conviction must stand.

The other aiding and abetting conviction stemmed from the July 7, 1997 discovery of six "rocks" of crack cocaine, weighing approximately 1.3 grams, in Hodges's apartment. We agree that the amount of cocaine involved could be consistent with personal use and, accordingly, is insufficient in and of itself to prove an intent to distribute. *See Payne*, 99 F.3d at 1279 & n.4. However, as described above, substantial evidence at trial showed that Hodges and Meshack frequently arranged for the purchase of crack cocaine, and that Meshack was integral to Hodges's acquisition, and sale, of the drugs. Accordingly, the government introduced sufficient evidence from which the jury could infer that Meshack "became associated with, participated in, and in some way acted to further the possession and distribution of the drugs." *United States v. Inocencio*, 40 F.3d 716, 726 (5th Cir. 1994); *see also Reliford*, 210 F.3d at 289.

Meshack's conviction for possession of marijuana with intent to distribute stemmed from the October 15, 1997 search of Meshack's Bar-B-Que, where authorities discovered a bag filled with 78.3 grams of marijuana in the tank of an uninstalled commode. The marijuana was split up into 16 small plastic baggies, each of consistent weight and size. Testimony at trial indicated that, in this form, the marijuana was packaged for distribution. Accordingly, Meshack was charged with the possession of this marijuana with the intent to distribute it.

Meshack does not challenge the "possession" element of the offense; rather, he argues that the amount of marijuana was consistent with personal use rather than distribution and, accordingly, there is no evidence of intent to distribute. We disagree. Even assuming that possessing 78.3 grams of marijuana was consistent with personal use, the marijuana here was packaged in a way that was

necessarily consistent with distribution. Moreover, as described above, there was substantial evidence from which the jury could infer that Meshack frequently engineered the sale of drugs from the Bar-B-Que. Accordingly, there was sufficient evidence for the jury to find that Meshack possessed the 78.3 grams of marijuana with the intent to distribute it.

**3**

Thomas also challenges the sufficiency of the evidence presented to convict him of possessing crack cocaine with intent to distribute. He claims both that the evidence was insufficient to prove possession, and that even if the government proved possession, it failed to prove his intent to distribute.

The government found 30.8 grams of crack cocaine under a couch on which Thomas was lying at the time the police entered the residence. Thomas further admitted that the couch was the place he usually slept in the house in which he lived. Further, when arrested, Thomas had on his person a pager and $255, mostly in $20 bills, the denomination in which a government witness testified crack cocaine is normally sold.

Thomas argues that, even though the crack cocaine was found underneath the couch on which he was sleeping at the time of his arrest, there is insufficient evidence that he "possessed" the crack cocaine. We disagree. Possession may be actual or constructive, *see United States v. Brito*, 136 F.3d 397, 410 (5ᵗʰ Cir. 1998), and "[c]onstructive possession has been defined as ownership, dominion, or control over the contraband itself *or* dominion or control over the premises in which the contraband is concealed," *United States v. Mergerson*, 4 F.3d 337, 349 (5ᵗʰ Cir. 1993) (emphasis in original). We require only "some circumstantial indicium of possession," *id.*, before finding constructive possession, and that plainly exists here. First, the crack cocaine was found hidden under

-14-

a couch on which Thomas was lying. Further, there was substantial testimony that Thomas was a frequent dealer of crack cocaine,[10] and Hatcher testified that Thomas admitted to him that some of the crack cocaine found in the house was his. Accordingly, the jury properly found that he possessed crack cocaine. *See United States v. DeLeon*, 170 F.3d 494, 497 (5th Cir. 1999).

The jury's finding that Thomas intended to distribute the crack cocaine was similarly supported by the evidence. The substantial amount of crack cocaine found, 30.8 grams, was itself enough evidence from which the jury could infer that Thomas did not intend to use the crack cocaine himself, but rather intended to distribute it. *See United States v. Kates*, 174 F.3d 580, 582 (5th Cir. 1999) (finding possession of 19.67 grams of cocaine alone sufficient to infer intent to distribute). Adding the substantial testimony that Thomas was a frequent drug dealer, the evidence was clearly sufficient to find that Thomas possessed the crack cocaine with the intent to distribute.

**C**

Meshack challenges his conviction under the "crackhouse statute," which criminalizes "knowingly open[ing] or maintain[ing] a place for the purpose of manufacturing, distributing, or using any controlled substance." 21 U.S.C. § 856(a)(1); *see also United States v. Chen*, 913 F.2d 183, 187 (5th Cir. 1990). To sustain the conviction, the government need not prove that drug distribution was the primary purpose of Meshack's opening or maintaining his Bar-B-Que, merely that drug distribution was "a significant purpose." *United States v. Soto-Silva*, 129 F.3d 340, 346 (5th Cir. 1997); *see also United States v. Roberts*, 913 F.2d 211, 220 (5th Cir. 1990) ("Section 856 states that it is an offense to maintain a place for 'the purpose' of manufacturing or distributing cocaine. The

---

[10] That testimony included: (1) Hatcher's testimony that Thomas often sold crack cocaine on his behalf, (2) Moore's testimony that he saw Thomas selling drugs, and (3) Walker and Smith's testimony that they purchased crack cocaine from Thomas on several occasions.

meaning of that phrase lies within the common understanding of jurors and needs no further elaboration.").

Meshack characterizes the relationship between the Bar-B-Que and the drug transactions as "tenuous." We do not agree with that characterization. It is true that, as Meshack describes, much of the testimony showed drug transactions occurring in the parking lot outside Meshack's Bar-B-Que rather than inside the restaurant. This, however, is not dispositive of the inquiry, because much of the evidence showed that the restaurant itself was an integral part of the drug distribution conspiracy. The most compelling evidence of this was the testimony of Bailey, who described that one method by which drug orders were placed was by calling the restaurant and asking for "a slab of ribs" or "undone ribs" as code for an ounce of crack or powder cocaine, respectively. This was not the only evidence, however. Smith, Hatcher, Peoples, and Bailey testified that their drug purchases were negotiated, at least in part, with Meshack at the Bar-B-Que, and Hatcher testified that he often paid for his drugs by cashing checks at the Bar-B-Que. Moreover, Kelley testified that his courier missions to pick up drugs for Meshack began by picking up the funding from Meshack at the Bar-B-Que.[11]

We have affirmed convictions under 21 U.S.C. § 856(a)(1) under far less evidence than exists here. *See Soto-Silva*, 129 F.3d at 346 ("The presence of the packaging supplies, empty marihuana bags, and a small amount of marihuana in the basement allowed a jury to conclude that someone had the purpose of distributing marijuana from the house."). Given that the maintenance of the Bar-B-

_____

[11] Meshack also argues that the evidence suggests that others engaged in drug activity near the Bar-B-Que, and "merely maintaining the premises so that others may engage in distribution is not a violation of section 856(a)(1)." *Soto-Silva*, 129 F.3d at 346. We disagree. From the evidence described above, the jury could easily have inferred Meshack's direct participation in the drug transactions and, therefore, his guilt under the "crackhouse" statute.

-16-

Que was essential to the code systems by which some of Meshack's customers ordered their drugs, that the code systems involved using the nature of the business to attempt to conceal drug trafficking, and that much of the drug business took place in and around the Bar-B-Que, we find sufficient evidence that Meshack knowingly maintained the restaurant with the substantial purpose of distributing controlled substances. Accordingly, we affirm Meshack's conviction under the "crackhouse" statute.

**D**

Meshack and Parker both challenge the sufficiency of the evidence present to convict them of conspiracy to launder money. The substantive statute prohibiting money laundering provides, *inter alia*, that:

> Whoever, knowing that property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity . . . [or] knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to a fine . . . or imprisonment of not more than twenty years, or both.

18 U.S.C. § 1956(a) (numbering omitted); *see also United States v. Gallo*, 927 F.2d 815, 822 (describing that the statute "prohibits knowing involvement in a financial transaction that uses the proceeds of some form of unlawful activity"). The statute defines "financial transaction" as "a transaction which in any way or degree affects interstate or foreign commerce . . . [or] involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree." 18 U.S.C. § 1956(c)(4).

**1**

Meshack challenges his conviction for conspiracy to commit money laundering on two grounds. First, he argues that the government failed to make a sufficient connection between his conduct and interstate commerce to support the conviction. Second, he argues that even if such a connection was made, the government failed to prove that any financial transaction was made to "promote" any criminal activity.[12]

The legislative history of § 1956(c)(4) indicates that the money-laundering statute "is intended to reflect the full exercise of Congress's power under the Commerce Clause." *United States v. Gallo*, 927 F.2d 815, 823 (5th Cir. 1991) (citing S. Rep. No. 433, 99th Cong., 2d Sess. 13 (1986)). Accordingly, because § 1956 regulates conduct that, in the aggregate, has a substantial effect on interstate commerce, to apply the statute constitutionally in any given case "the link to interstate or foreign commerce need only be slight." *Westbrook*, 119 F.3d at 1191.

The requisite nexus plainly exists in this case. In *Westbrook*, we held that the defendants' purchases of two Mercedes-Benz automobiles, for a total of $20,000 in cash, had a sufficient connection with interstate commerce to justify a money laundering conviction. *See id.* at 1192. We stated that Congress had determined that drug trafficking affected interstate commerce in and of itself, and since in that case the government had provided evidence that the defendants had purchased

---

[12]        Meshack also vaguely challenges the evidence that the payments the government claims constituted money laundering—the purchase of a truck and the payment of rent for an apartment—were made from drug funds. However, "[e]vidence that a defendant's cash outflow in a financial transaction exceeds his legitimate income is sufficient to show that the transaction involves the proceeds of specified unlawful activity, even if the defendant claims income from other sources." *United States v. Westbrook*, 119 F.3d 1176, 1191 (5th Cir. 1997). Here, the government provided evidence not only that the Bar-B-Que was unprofitable, but that Meshack's lifestyle exceeded any potential income by at least $170,000. Additionally, testimony at trial indicated that Meshack paid for the truck by submitting to the seller $10,000 cash in a brown paper bag. Therefore, there was sufficient evidence to prove that both payment of Parker's rent and the purchase of the truck came from the proceeds of drug transactions.

the vehicles from drug proceeds and used them to continue their conspiracy, the evidence sufficiently established a connection with interstate commerce. *See id.* Similar evidence is present in this case: the government provided substantial evidence both that Meshack purchased a 1993 Ford pickup truck with drug proceeds and that he used the truck in later drug sales. As in *Westbrook*, sufficient evidence exists that Meshack's purchase of the truck "affected interstate commerce 'in [some] way or degree.'" *Id.*[13]

The government also alleges that Meshack's use of drug money to pay rent on Parker's apartment, from which many acts in furtherance of the conspiracy originated, constitutes a sufficient connection with interstate commerce to allow a money laundering conviction. We agree. The Supreme Court has unequivocally held that renting property implicates interstate commerce. *See Russell v. United States*, 471 U.S. 858, 862, 105 S. Ct. 2455, 85 L. Ed. 2d 829 (1985) ("By its terms . . . the statute only applies to property that is 'used' in an 'activity' that affects commerce. The rental of real estate is unquestionably such an activity. . . . The congressional power to regulate the class of activities that constitute the rental market for real estate includes the power to regulate individual activity within that class."). Accordingly, because Congress has the power to regulate payments made in renting property, and because the money-laundering statute "is intended to reflect

---

[13] Meshack relies on *United States v. Sanders*, 929 F.2d 1466, 1472 (10th Cir. 1991), where the Tenth Circuit held that there was insufficient evidence that the purchase of two vehicles constituted money laundering. The Tenth Circuit's opinion in *Sanders*, however, had nothing to do with the lack of a connection between interstate commerce and the purchase; rather, the opinion held the evidence insufficient to prove "concealment in defendant's car purchases." *Id.* at 1473. That fact was important in *Sanders* because in that case the government proceeded under only one prong of the money laundering statute: the prong prohibiting entering into a financial transaction "knowing that the transaction is designed in whole or in part—to conceal or disguise the nature . . . [of] the proceeds of specified unlawful activity." *Id.*; *see* 18 U.S.C. § 1956(a)(1)(B). In this case, however, desire to conceal the nature of the transaction is irrelevant because the government proceeded under that prong as well as the prong of the statute prohibiting entering into a financial transaction "with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(A). Accordingly, the analysis presented by *Sanders* is irrelevant, and *Westbrook* is a far more apt analogy.

the full exercise of Congress's power under the Commerce Clause," *Gallo*, 927 F.2d at 823, the interstate connection presented here is sufficient.

Meshack also argues that the government failed to prove that his intent in the alleged transactions—the purchase of the truck and the rental of Parker's apartment—was to promote the carrying on of his illegal activity. The evidence presented at trial, however, proved the contrary: witnesses testified that the truck was used by Meshack and Parker to assist their delivery of drugs. There was also evidence that Meshack stored drugs at Parker's apartment and used its location in an attempt to conceal the conspiracy. The jury could properly have inferred from this evidence all of the elements necessary to convict under 18 U.S.C. § 1956.

**2**

Parker similarly challenges her conviction for conspiracy to launder money. She argues that: (1) the only overt act remotely involving her, the rental of her apartment, did not have a sufficient connection with interstate commerce, and (2) she cannot be convicted of this offense because she did not conduct the transaction of renting the apartment.

As described above, the rental of Parker's apartment was sufficiently connected with interstate commerce to allow a money laundering conviction, and the government put forth sufficient evidence to support that conviction. The only issue remaining, therefore, is whether Parker's involvement in the renting of the apartment was sufficient to support a conspiracy conviction.

The elements of a conspiracy to commit money laundering conviction are: (1) that there was an agreement between two or more persons to commit money laundering, and (2) that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose. *See United States v. Threadgill*, 172 F.3d 357, 366 (5th Cir.), *cert. denied* — U.S. —, 120 S. Ct. 172, 145

L. Ed. 2d 146 (1999). Thus, the jury instructions in this case properly defined the requisite conduct necessary to convict as "initiating or concluding, or participating in initiating or concluding a transaction."

The evidence presented in this case was clearly sufficient for the jury to infer that Parker participated in the use of the apartment to launder money. First, Parker signed the lease. Second, testimony at trial indicated that Parker had no non-drug related income for at least two years preceding her arrest and that she was Meshack's girlfriend who had all her needs taken care of by Meshack. Testimony also indicated that Parker was involved in the storage of drugs at her apartment, and that other activity integral to the conspiracy was conducted from the apartment. Accordingly, we agree with the government that "the jury could reasonably conclude that an unemployed person who was otherwise without funds to pay her rent, obtained the money to pay her rent from Appellant Meshack and that the money was proceeds from the drug trafficking."

**III**

At sentencing, the district court determined the amount of drugs for which each defendant was respo nsible. Thus, the jury did not make this finding, the amounts were determined by a preponderance of the evidence rather than beyond a reasonable doubt, and the indictment did not charge the relevant amounts. We have continually endorsed this handling of a § 841 case, holding that drug amount is a sentencing enhancement entrusted to the judge's determination rather than an element of the offense which must be determined by the jury. *See, e.g., United States v. Dickey*, 102 F.3d 157, 163 (5th Cir. 1996); *United States v. Royal*, 972 F.2d 643, 650 (5th Cir. 1992).

The defendants argue t hat this approach has been invalidated by a recent line of Supreme Court cases. Relying on these cases, they argue that drug amount is an element of a § 841 offense

-21-

which must be charged in the indictment and which must be found by a jury beyond a reasonable doubt.

In *Jones v. United States*, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999), the Supreme Court vacated a sentence under the federal carjacking statute. The Court determined, as a matter of statutory interpretation, that the statute's enhanced sentence for carjacking involving "serious bodily injury" actually constituted a distinct offense, which accordingly must be specifically charged in the indictment, submitted to the jury, and proved beyond a reasonable doubt. *See id.* at 230, 239, 119 S. Ct. 1215 (quoting 18 U.S.C. § 2119). The Court premised its reversal in part on constitutional concerns which would be raised by the contrary reading allowing a judge to treat "serious bodily injury" as a sentence enhancement and thus determine whether it occurred at sentencing by a preponderance of the evidence. *See id.* at 240, 119 S. Ct. 1215.[14]

After the briefing was complete in this case, the Supreme Court issued its opinion in *Apprendi v. New Jersey*, — U.S. —, 120 S. Ct. 2348, — L. Ed. 2d — (2000). In *Apprendi*, the Court formally announced the constitutional principle *Jones* had suggested: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 2262-63. Applying this principle, the Court held that a sentence enhancement under New Jersey's hate crime statute—which

---

[14] We subsequently held that *Jones* did not merit reversal of a § 841 conviction under plain error review where the amount of drugs was not alleged in the indictment or proved to the jury. *See United States v. Rios-Quintero*, 204 F.3d 214, 219 (5th Cir. 2000) ("[W]e cannot conclude that the Supreme Court's identification of unresolved constitutional issues in *Jones* is sufficiently plain or obvious with respect to its application to the federal drug trafficking statutes to permit a finding of remediable plain error in this case."). Noting our reticence to overturn prior case law based on unclear statements in *Jones*, we noted that the defendant had notice of the drug amount through a notice of enhancement filed with the indictment, and we noted that the amount of quantity was undisputed because the defendant stipulated to it and conceded it before the jury. *See id.* at 219.

As discussed herein, *Apprendi v. New Jersey*, — U.S. —, 120 S. Ct. 2348, — L. Ed. 2d — (2000) goes beyond *Jones* and more clearly purports to announce a general rule of constitutional law.

-22-

allowed the trial court to increase the maximum sentence for the underlying offense if it found by a preponderance of the evidence that the defendant "acted with a purpose to intimidate an individual . . . because of race"—violated due process because the factual basis for the enhancement was not found "by a jury on the basis of proof beyond a reasonable doubt."[15] *Id.* at 2351.

The broad rule of constitutional law announced in *Apprendi* calls into question our prior rule that drug amount is not an element of a § 841 case. We need not reconcile this apparent conflict here, however, because the government "conced[es] that the *Apprendi* decision applies to 21 U.S.C. § 841."[16] Thus, we need only address whether *Apprendi's* conceded applicability mandates correction of the various defendants' sentences.

We review the defendants' challenges to their sentences for plain error in light of their failure to raise these objections below. *See United States v. Johnson*, 520 U.S. 461, 467, 117 S.Ct. 1544, 1549, 139 L.Ed.2d 718 (1997) (reviewing for plain error even though the case on which the

---

[15] *Apprendi* only addressed whether certain facts must be proved to and found by the jury. It did not address whether these facts must also be alleged in the indictment, because the defendant did not advance this argument. *See id.* at 2355 n.3. However, the opinion, in conjunction with *Jones*, clearly indicates that a fact which must be proved to the jury is an element of the offense that must also be alleged in the indictment. *See*, *e.g.*, *id.* at 2368 (Thomas, J., concurring) (noting the requirement that a defendant be notified of the charges against him and stating that this "protection[] turn[s] on determining which facts constitute the 'crime'—that is, which facts are the 'elements' or 'ingredients' of a crime"); *Jones*, 526 U.S. at 232, 119 S. Ct. 1215 ("[E]lements must be charge in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt."). The parties assume this to be the law.

[16] The government's concession is bolstered by additional case law. Prior to *Apprendi*, the Tenth Circuit determined that an indictment's reference to one of the specific sentence provisions in 21 U.S.C. § 841, without mentioning drug amount, did not preclude the district court from imposing a higher sentence than the maximum allowed by the referenced subsection when the court found that a greater amount of drugs was involved in the offense. *See United States v. Jones*, 194 F.3d 1178, 1183-86 (10th Cir. 1999). The Supreme Court subsequently vacated the Tenth Circuit's decision and remanded for reconsideration in light of *Apprendi*. *See Jones v. United States*, — U.S. —, 120 S. Ct. 2739, — L. Ed. 2d — (2000). The government notes that, in the same case, the Solicitor General essentially conceded that the ruling which the Court ultimately issued in *Apprendi* would invalidate the enhancement imposed by the court based on drug amount.

Further, we note that after *Apprendi* was decided, the Eighth Circuit ruled that *Apprendi* applies in the context of drug convictions under 21 U.S.C. § 841. *See United States v. Aguayo-Delgado*, 2000 WL 988128, at *6 (8th Cir. July 18, 2000).

defendants relied had not been decided at the time of trial). This requires the defendants to show "(1) an error; (2) that is clear or plain; (3) that affects the defendant's substantial rights; and (4) that seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Vasquez*, 216 F.3d 456, 459 (5th Cir. 2000).

## A

All the defendants but Parker challenge some aspect of their terms of imprisonment. Thomas challenges his 168-month sentence for crack cocaine possession. Even accepting the government's *Apprendi* concession, there was no error in his sentence. Thomas was charged with possession of crack cocaine under 21 U.S.C. § 841(a)(1), and the jury found that he had violated this section beyond a reasonable doubt. The minimum statutory range for this offense was zero to twenty years. *See* 21 U.S.C. § 841(a)(1). As his 168-month sentence was within this range, it was permissible, because Thomas's sentence was not enhanced beyond the statutory range based on a fact not contained in the indictment or presented to the jury. *See Apprendi*, 120 S. Ct. at 2362-63.

Thomas disputes this by arguing that, although the amount of crack cocaine he was charged with possessing did not enhance his sentence *beyond* the statutory sentence range, it did cause him to receive a higher sentence *within* this range based on the application of a Sentencing Guidelines enhancement. *Apprendi* does not clearly resolve whether an enhancement which increases a sentence within the statutory range but which does not increase the sentence beyond that range must be proved to the jury.[17] However, the opinion suggests the more limited rule: "fact[s] that increase[] the

---

[17]     The principal dissent in *Apprendi* criticizes the majority opinion for its unclear scope, noting the "Court's failure to clarify the contours of the constitutional principle underlying its decision." *Id.* at 2389 (O'Connor, J., dissenting). The dissent then reviews several alternative readings of the majority's central rule, two of which are relevant here: (1) "under one reading, the Court appears to hold that the Constitution requires that a fact be submitted to a jury and proved beyond a reasonable doubt only if that fact, as a formal matter, extends the range of punishment beyond the prescribed statutory maximum," *id.*; and (2) "The actual principle underlying the Court's decision may be

penalty for a crime *beyond* the prescribed *statutory* maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 120 S. Ct. at 2362-63 (emphasis added). Additionally, the *Apprendi* majority expressly declined to reverse an earlier opinion allowing a judge to determine by a preponderance whether an enhancement should apply, instead limiting that case's "holding to cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict." *Id.* at 2361 n. 13 (discussing *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S. Ct. 2411, 91 L. Ed. 2d 67 (1986), and noting that it might reconsider the holding in the future). Given that the more limited reading of *Apprendi* is a more plausible reading of the case, and given the profound effect a broader rule would have on existing Supreme Court and Fifth Circuit precedent, we believe the limited reading of *Apprendi* is the more desirable one. *Cf. United States v. Aguayo-Delgado*, 2000 WL 988128, at *7 (8th Cir. July 18, 2000) ("If the non-jury factual determination only narrows the sentencing judge's discretion within the range already authorized by the offense of conviction, . . . then the governing constitutional standard is provided by *McMillan*. As we have said, *McMillan* allows the legislature to raise the minimum penalty associated with a crime based on non-jury factual findings, as long as the penalty is within the range specified for the crime for which the defendant was convicted by the jury."). Thus, because Thomas's sentence did not exceed the statutory maximum sentence with which he was charged and which was tried to the jury, his sentence did not violate *Apprendi*.

---

that any fact (other than prior conviction) that has the effect, in real terms, of increasing the maximum punishment beyond an otherwise applicable range must be submitted to a jury and proved beyond a reasonable doubt," *id.* at 2391; *see also id.* at 2393-94 ("The principle thus would apply not only to schemes like New Jersey's, under which a factual determination exposes the defendant to a sentence beyond the prescribed statutory maximum, but also to all determinate-sentencing schemes in which the length of a defendant's sentence within the statutory range turns on specific factual determinations (*e.g.*, the federal Sentencing Guidelines)."). While the second reading is plausible, we find that the first reading is sounder for the reasons discussed above.

Hodges challenges his ten-year sentence for marijuana possession, but he does not challenge his 324-month sentence for conspiracy to possess crack cocaine.[18] The government argues that Hodges's failure to challenge his longer conspiracy sentence renders his challenge to his concurrent possession sentence irrelevant. Reviewing Hodges's sentence for plain error, we agree.

To show plain error, Hodges must show that the sentence he received for marijuana possession "affects [Hodges's] substantial rights." *Vasquez*, 216 F.3d at 459. This element of the plain error test generally requires the defendant to establish prejudice. *See United States v. Cabral-Castillo*, 35 F.3d 182, 189 (5th Cir.1994). *Apprendi* allows for only a sentencing challenge, not a challenge to the underlying conviction, and in sentencing cases we have generally determined prejudice by considering whether the alleged error resulted in an increased sentence for the defendant. *See United States v. Phillips*, 210 F.3d 345, 351 n.5 (5th Cir. 2000) (reviewing plain error sentencing cases). Here, Hodges cannot show that he received a longer sentence in light of his lengthier concurrent conspiracy sentence, and thus he arguably cannot show a violation of his substantial rights as we use that phrase for purposes of plain error analysis.

We need not decide this case by finding that Hodges's substantial rights were not violated, however, because even assuming they were, we correct plain error only if we determine in our discretion that the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Franks*, 46 F.3d 402, 404 (5th Cir. 1995) (quoting *United States v. Olano*, 507 U.S. 725, 736, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993)) (alteration in original). We

---

[18] Under our above-stated reasoning, Hodges conspiracy sentence was proper. The minimum statutory range to which he was subject for conspiracy to possess crack cocaine, given his prior offenses, was thirty years. *See* 21 U.S.C. § 841(b)(1)(C); *see also Apprendi*, 120 S. Ct. at 2362-63 (excepting a prior conviction from the rule that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"). Given that his 324-month sentence fell within this range, it does not create an *Apprendi* problem.

decline to exercise our discretion in this manner here because Hodges can show no meaningful benefit he would receive from vacating this sentence,[19] *Cf. United States v. Williams*, 183 F.3d 458, 464 (5th Cir. 1999) ("[L]eaving Williamson incarcerated for 30 years when he should have been sentenced to no more than 15 under existing precedent, especially when we gave the benefit of the legal rule to others appealing their convictions during that time, seriously would affect the fairness, integrity and public reputation of judicial proceedings by undermining the rule of law"). He will not serve less time as a result of resentencing on this count. Moreover, he has not asserted that our decision not to correct the sentence will have collateral consequences. Thus, we find there was no plain error in Hodges's sentence for marijuana possession.

Meshack challenges his concurrent life sentences for conspiracy to possess crack cocaine and for crack possession. Although he does not challenge his other concurrent sentences, the plain error analysis we applied to uphold Hodges's possession sentence does not allow us to uphold Meshack's life sentences because these sentences are longer, at least in theory, than his unchallenged concurrent sentence of 360 months for a different crack cocaine possession count. Thus, in light of the government's concession that *Apprendi* applies, we must vacate Meshack's two life sentences and remand to the district court for appropriate proceedings.[20]

**B**

In addition to challenging the terms of their imprisonment, each defendant challenges the term of supervised release he or she was given. Taking these challenges in turn, each defendant's term

---

[19]        Hodges cannot show that correcting the error would invalidate one of the convictions against him, as the conceded error does not call Hodges's conviction into question.

[20]        On remand, the district court must resentence Meshack pursuant to 21 U.S.C. § 841(b)(1)(C). Due to his prior convictions, Meshack may be resentenced to a maximum of 30 years.

requires some correction.

Under plain error review, we correct overlong terms of supervised release. *See United States v. Kelly*, 974 F.2d 22, 24-25 (5th Cir. 1992). However, three of the defendants here received multiple concurrent terms of supervised release. Applying the reasoning announced above, we only find plain error in these concurrent terms if the error actually resulted in a longer term of supervised release; that is, we need only adjust overlong terms of supervised release down to what would be the longest term had supervised release been calculated in accordance with *Apprendi*.

Thomas and Parker received five-year terms of supervised release for their respective crack cocaine possession and crack conspiracy convictions. We must reduce these terms to the maximum term allowable by statute for crack cocaine possession which does not require some showing of drug amount, which for both defendants is three years. *See* 18 U.S.C. § 3583(b)(2) (providing, in the default supervised release statute, for a term of supervised release of "not more than three years" for Class C felonies); 21 U.S.C. § 841(b)(1)(C) (providing for "a term of supervised release of at least 3 years"); *Kelly*, 974 F.2d at 24-25 (reducing a term of supervised release to three years in a similar case by harmonizing the three-year minimum in § 841(b)(1)(C) with the three-year maximum in § 3583(b)). Thus, we vacate Parker's and Thomas's terms of supervised release and remand them for further proceedings below.

Hodges's and Meshack's longest terms of supervised release are both ten years, covering their conspiracy to possess crack cocaine convictions and Meshack's crack possession conviction. In both cases, the maximum term of supervised release irrespective of drug amount—based on their prior offenses—is six years. *See* 21 U.S.C. § 841(b)(1)(C); *cf.* 18 U.S.C. § 3583(b)(2) (limiting the term of supervised release for class B felonies to no more than five years, and to three years maximum for

Class C felonies, "[e]xcept as otherwise provided").  Thus, we also vacate and remand their terms of supervised release for the district court to modify as it deems appropriate.

## IV

Parker argues that the trial court committed various errors in instructing the jury and that certain material was impermissibly presented to the jury.[21]

## A

Parker argues that the district court's jury instruction on her money laundering charge impermissibly broadened the indictment.  Because she raises this issue for the first time on appeal, we review for plain error.  *See Threadgill*, 172 F.3d at 370.

The Fifth Amendment protects a defendant against being tried on a charge not contained in a grand jury indictment.  *See id.* at 370.  This right is violated when the district court constructively amends the indictment by "allow[ing] proof of an essential element of a crime on an alternative basis permitted by statute but not charged in the indictment."  *Id.* (quoting *United States v. Arlen*, 947 F.2d 139, 144 (5ᵗʰ Cir. 1991)).

Citing the court's instruction defining money laundering, Parker argues that the court constructively amended the indictment by failing to limit the jury's consideration of evidence of money laundering to the evidence identified in the indictment.  Her argument ignores the fact that the court separately defined the offense of conspiracy to launder money, instructing the jury that one of the conspirators, in support of the conspiracy, must have committed one of the overt acts "described

---

[21]    In addition, she challenges the effectiveness of her trial counsel's performance, arguing that her counsel's failure to object to these various errors below (in addition to other alleged deficiencies) was ineffective. However, we do not deviate here from our general rule that these claims cannot be brought on direct appeal absent their having been raised adequately in the district court.  *Cf. United States v. Gibson*, 55 F.3d 173, 179 (5ᵗʰ Cir. 1995) (reaching ineffective assistance claims on direct appeal because they had been raised by the appellant in his post-trial motions).

in Count Fourteen of the Indictment." This disposes of Parker's argument, as we have previously held that, where a money laundering conspiracy charge is properly limited, any potential problems in a related (and incorporated) definition of money laundering do not effect a constructive amendment of the portion of the indictment charging conspiracy. *See id.* at 370-71.

**B**

The indictment and the jury instructions identified the elements of a conspiracy to launder money and then described the substantive offense of money laundering. In describing the substantive offense, both noted the two alternative mental states for which a defendant can be found guilty of money laundering: (1) "intent to promote" the underlying illegal activity, 18 U.S.C. § 1956(a)(1)(A)(I); or (2) engaging in the act "knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," *id.* § 1956(a)(1)(B)(I) (numbering omitted). Parker's second challenge to the jury instruction is that, given the alternative mental states for the substantive offense of money laundering, the judge should have instructed the jury that it must unanimously agree as to which alternative state existed before finding her guilty. She implicitly argues that the general unanimity instruction the court gave, requiring the verdict to be "unanimous as to each count of the indictment," was insufficient. Because Parker did not object to the lack of such a unanimity instruction at trial, we review her claim for plain error. *See United States v. Alford*, 999 F.2d 818, 822 (5th Cir. 1993).

In *Alford*, we held that the court's failure to instruct the jury that it must unanimously agree as to which of the two above-noted mental states the defendant possessed was not plain error. *See id.*; *see also United States v. Navarro*, 145 F.3d 580, 592 (3d Cir. 1998) (same). Without

-30-

acknowledging *Alford*, Parker argues that a recent Supreme Court case, *Richardson v. United States*, 526 U.S. 813, 119 S. Ct. 1707, 143 L. Ed. 2d 985 (1999), requires reversal of her conviction. However, apart from citing *Richardson*, Parker advances no persuasive reason for revisiting *Alford*, and we see none.

*Richardson* dealt with the continuing criminal enterprise statute (the "CCE" statute), which requires the government to prove that a current drug violation "is a part of a continuing series of violations." 21 U.S.C. § 848(a). The issue before the Court was whether the jury must unanimously agree on which specific prior "violations" the defendant had committed; *i.e.*, "whether the statute's phrase 'series of violations' refers to one element, namely a 'series,' in respect to which the violations constitute the underlying brute facts or means, or whether those words create several elements, namely the several 'violations,' in respect to *each* of which the jury must agree unanimously and separately." *Richardson*, 526 U.S. at 817-18, 119 S. Ct. 1707 (emphasis added). Adopting the latter reading, the Court ruled that the jury must agree on which specific violations the defendant had committed. *See id.* at 824, 119 S. Ct. 1707.

*Richardson* is dissimilar from this case in two significant regards. First, the court's analysis of the CCE statute is only marginally applicable to the money laundering statute. The *Richardson* Court made clear that it premised its holding on the fact that tradition generally "requir[es] juror unanimity where the issue is whether a defendant has engaged in conduct that violates the law." *Id.* at 819, 119 S. Ct. 1707. It also noted the risk of unfairness which could result from not treating each violation as a separate element in light of the breadth of conduct which could constitute a "violation."

*See id.* Parker has identified no similar concerns raised by the statute at issue here.[22]

This failure is dispositive in light of the second critical difference between *Richardson* and our case: unlike *Richardson*, where the defendant asked the trial court to provide the specific unanimity instruction, we are limited to plain error review because Parker made no similar request below. Given this and the above-noted difference between *Richardson* and this case, we cannot conclude that *Richardson* overruled our holding in *Alford* that the absence of a specific unanimity instruction was not plain error.[23]

**C**

Parker next challenges the court's instruction that: "It is also your duty to base your verdict solely upon the evidence, without prejudice or sympathy."[24] She did not object to this instruction below, and we review for plain error. *See United States v. Hernandez-Guevara*, 162 F.3d 863, 873 (5th Cir. 1998).

---

[22] Parker briefly alludes to the "potential breadth of the [money laundering] statute, and the risk that juries will confuse money laundering with money spending." We are unpersuaded. The distinction between using money to "promote" unlawful activity, as opposed to using it to "conceal or disguise the nature of" unlawful activity, is minimal. Promotion and concealment are extremely similar and do not rival the breadth of prior "violations" which could support a conviction under the CCE statute. *See Richardson*, 526 U.S. at 819, 119 S. Ct. 1707 (noting that the term "violations" encompassed many different acts which varied significantly in seriousness). Additionally, Parker offers no explanation for why a specific unanimity requirement would prevent a jury from confusing "money laundering" with "money spending," when both are somewhat similar mental states which clearly link the use of the money to the illegal activity.

[23] We find support for this conclusion in *Navarro*, where the Third Circuit reached the same conclusion we reach now. *See Navarro*, 145 F.3d at 592 ("[W]e conclude that . . . it is neither clear nor obvious that the . . . alternative mental states defined in § 1956 could not properly be treated as a separate means of committing a single offense. . . . [U]nder a plain error standard of review, no specific unanimity instruction was necessary."). Although *Navarro* was decided before *Richardson*, it generally addressed the same factors considered by the *Richardson* Court. *See id.* at 586-92. Indeed, the *Navarro* court reached its conclusion after noting its prior precedent holding that the CCE statute required unanimity as to each prior conviction, *see id.* at 586-87, precedent the Court cited with approval in *Richardson*, *see Richardson*, 526 U.S. at 816, 119 S. Ct. 1707.

[24] Parker does not fully explain what her "sympathy" defense was, but she suggests that it relates to her age (she was 52 at the time of trial), her prior drug conviction, and the supposedly "legitimate inference from the evidence that [she] was indicted for the sole purpose of pressuring her to testify against Hugh Von Meshack."

The court took the instruction Parker now challenges directly from the Fifth Circuit model jury instructions. *See* Committee on Pattern Jury Instructions, Fifth Circuit, *Pattern Jury Instructions (Criminal Cases)*, § 1.04 (1997). We have commented on this instruction's curative value several times without ever questioning its propriety. *See United States v. Vaccaro*, 115 F.3d 1211, 1218 (5th Cir. 1997) (concluding that this instruction helped alleviate any prejudice from the prosecutor's improper comments); *United States v. Canales*, 744 F.2d 413, 431-33 (5th Cir. 1984) (same). Additionally, the Supreme Court has generally approved instructions which limit the jury's consideration of "sympathy" in the penalty phase of capital cases. *See California v. Brown*, 479 U.S. 538, 542-43, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987). This analogous precedent, and Parker's inability to cite any contrary precedent, makes clear that the instruction was not plain error.

**D**

Parker challenges the government's use of certain materials at trial which were never admitted into evidence. As she did not object to any of this material below, we review its use for plain error. *See United States v. Richardson*, 168 F.3d 836, 838 (5th Cir. 1999).

First, Parker catalogs various pieces of evidence which appeared on the government's exhibit list but which were not admitted into evidence. Parker never contends that these items were actually presented to the jury. Insofar as they were not, there can be no error from their merely appearing on the exhibit list.

The government, however, concedes that two of these pieces of evidence—checks which were issued to Hatcher—were presented to the jury but not admitted into evidence. The government argues that the failure to admit these checks as exhibits was inadvertent and that Parker was not prejudiced by them because they were merely used to support the witness's testimony and were not

sent into the jury room.  Parker does not contest this or otherwise show how the checks, which were

mentioned once each and in combination with other evidence about how Hatcher made payments to

Meshack, could possibly have prejudiced her by having not been admitted into evidence.  The cases

she relies on, which address material inadvertently and improperly given to the jury during

deliberations, are clearly inapplicable.  *See United States v. Renteria*, 625 F.2d 1279, 1284-85 (5th

Cir. 1980); *Llewellyn v. Stynchcombe*, 609 F.2d 194, 195 (5th Cir. 1980).

Second, Parker alleges that she suffered prejudice when the government was allowed to

present a chart to the jury which was not admitted into evidence.  The chart, which was prepared by

Pennington, showed Meshack's expenditures from 1994 to 1997.  The government presented the

chart in accompaniment to Pennington's testimony about his review of Meshack's financial records.[25]

The government argues the chart was permissibly used under Federal Rule of Evidence 611,

which we have interpreted as allowing "the use of a chart as a demonstrative aid to summarize the

evidence."[26] *United States v. Posada-Rios*, 158 F.3d 832, 869 (5th Cir. 1998).  Significantly, we have

suggested that chart use under Rule 611 is limited to instances where "the court gives the jury

appropriate limiting instructions."  *Id.* ("The district court's rulings allowing the use of the charts,

when accompanied by the court's repeated limiting instructions, was not an abuse of discretion."); *see*

*also United States v. Taylor*, 210 F.3d 311, 315 (5th Cir. 2000) ("Such demonstrative aids typically

---

[25]     Parker never fully explains how this evidence, which primarily concerned Meshack and which Meshack has not challenged (other than by adopting Parker's arguments), actually prejudiced her.  However, we assume for purposes of argument that it could have this effect.

[26]     In contrast to Rule 611, Rule 1006 allows charts to be admitted into evidence when they summarize "[t]he contents of voluminous writings."  Fed. R. Evid. 1006; *United States v. Taylor*, 210 F.3d 311, 315 (5th Cir. 2000) ("In contrast [to Rule 611], Rule 1006 applies to summary charts based on evidence previously admitted but which is so voluminous that in-court review by the jury would be inconvenient.").  In light of the similar concerns at issue in Rule 1006 and Rule 611 cases, Rule 1006 cases are instructive in analyzing this Rule 611 issue.

are permissible to assist the jury in evaluating the evidence, provided the jury is forewarned that the charts are not independent evidence."); *United States v. Ramos*, 71 F.3d 1150, 1155 (5th Cir. 1995) (rejecting a challenge to summaries prepared by the prosecution because their contents "fall within the wide scope of appropriate argument" and because "[t]he judge's charge put the summaries in proper perspective"). Here, the court gave no limiting instruction specifically addressing the chart, either at the time it was presented or during the general charge to the jury.[27]

The absence of a proper limiting instruction is not, however, dispositive to our plain error analysis. Slavish reliance on the presence of such an instruction would have the undesirable effect of encouraging defendants not to object to evidence or ask for proper limiting instructions so that they could successfully challenge it on appeal. Instead, we hold that when reviewing for plain error, we consider whether other factors suggesting permissible use of the chart allow such use to survive plain error review. Here, such factors are present. Although the government presented the chart through a witness, Parker does not contend that the chart was sent into the jury room. Nor was the chart admitted into evidence. *See Taylor*, 210 F.3d at 315 ("[S]uch charts are not admitted into evidence and should not go to the jury room absent consent of the parties."). Additionally, Parker had the opportunity to cross-examine Pennington about the chart, in order to highlight errors in it for the jury. *Cf. United States v. Possick*, 849 F.2d 332, 339-40 (8th Cir. 1988) (finding that the court's admission of charts into evidence under Rule 1006 and its decision to allow the chart to be sent to the jury without a limiting instruction did not constitute reversible error "[i]n light of the strength of

---

[27] The government curiously identifies the court's instructions to the jury that statements by lawyers are not evidence and that they need not follow opinions expressed by experts as proper instructions regarding the chart. Of course, neither of these has any relevance to testimony from a witness about documentary material he reviewed and summarized for a jury, as this was neither a lawyer's statement nor an expert opinion.

the evidence against Possick and the amount of other evidence offered during the seven-day trial, coupled with the opportunity Possick's counsel had during closing argument and cross-examination to comment on and minimize the charts' effectiveness"). Finally, Parker does not show that the chart contained misleading or erroneous information. *Cf. Taylor*, 210 F.3d at 315 (finding that a chart should not have been admitted into evidence where it "did not accurately reflect the underlying testimony"); *Possick*, 849 F.2d at 349 ("On the whole, the charts were straightforward and accurate, and we cannot find that the district court abused its discretion in permitting their use."). Under these circumstances, we find no plain error in the fact that the chart was presented to the jury as an aid to Pennington's testimony.

## V

Accordingly, we AFFIRM the convictions of all four defendants. We VACATE Meshack's sentences of life imprisonment and REMAND for proceedings not inconsistent with this opinion. We also VACATE the terms of supervised release as discussed herein and REMAND for further proceedings not inconsistent with this opinion. We otherwise AFFIRM the sentences of all four defendants.